# BLONDER-TONGUE LABORATORIES, INC. *v.* UNIVERSITY OF ILLINOIS FOUNDATION ET AL.

No. 338.   Argued January 14, 1971—Decided May 3, 1971

WHITE, J., delivered the opinion for a unanimous Court.

*Robert H. Rines* argued the cause for petitioner. With him on the brief were *Richard S. Phillips, Paul J. Foley,* and *Nelson H. Shapiro.*

*William A. Marshall* argued the cause for respondent University of Illinois Foundation.   With him on the brief were *Charles J. Merriam* and *Basil P. Mann.*   *Sidney G. Faber* argued the cause for respondent JFD Electronics Corp.   With him on the brief were *Jerome M. Berliner, Robert C. Faber,* and *Myron C. Cass.*

*Assistant Attorney General McLaren* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Gray, Peter L. Strauss, Howard E. Shapiro,* and *Walter H. Fleischer.*

314

Briefs of *amici curiae* were filed by *Donald R. Dunner, James B. Gambrell,* and *W. Brown Morton, Jr.,* for the American Patent Law Association; by *Theodore W. Anderson* for the Automatic Electric Co.; by *Harold F. McNenny, John F. Pearne,* and *Walther E. Wyss* for the Finney Co.; and by *Joseph B. Brennan* and *Richard D. Mason* for the Kawneer Co., Inc.

MR. JUSTICE WHITE delivered the opinion of the Court.

Respondent University of Illinois Foundation (hereafter Foundation) is the owner by assignment of U. S. Patent No. 3,210,767, issued to Dwight E. Isbell on October 5, 1965. The patent is for "Frequency Independent Unidirectional Antennas," and Isbell first filed his application May 3, 1960. The antennas covered are designed for transmission and reception of electromagnetic radio frequency signals used in many types of communications, including the broadcasting of radio and television signals.

The patent has been much litigated since it was granted, primarily because it claims a high quality television antenna for color reception.[1] One of the first infringement suits brought by the Foundation was filed in the Southern District of Iowa against the Winegard Co., an antenna manufacturer.[2] Trial was to the court, and after pursuing the inquiry mandated by *Graham* v. *John Deere Co.,* 383 U. S. 1, 17–18 (1966), Chief Judge Stephenson held the patent invalid since "it would have been obvious to one ordinarily skilled in the art and wishing to design a frequency independent unidirectional

---

[1] The Foundation has filed six infringement actions based on the Isbell patent. Foundation's Brief 22.

[2] The Foundation claimed that all of the Isbell patent's 15 claims except numbers 6, 7, and 8 were infringed by one or more of Winegard's 22 antenna models designed for receiving television signals.

antenna to combine these three old elements, all suggested by the prior art references previously discussed." *University of Illinois Foundation* v. *Winegard Co.*, 271 F. Supp. 412, 419 (SD Iowa 1967) (footnote omitted).[3] Accordingly, he entered judgment for the alleged infringer and against the patentee. On appeal, the Court of Appeals for the Eighth Circuit unanimously affirmed Judge Stephenson. 402 F. 2d 125 (1968). We denied the patentee's petition for certiorari. 394 U. S. 917 (1969).

In March 1966, well before Judge Stephenson had ruled in the *Winegard* case, the Foundation also filed suit in the Northern District of Illinois charging a Chicago customer of petitioner, Blonder-Tongue Laboratories, Inc. (hereafter B-T), with infringing two patents it owned by assignment: the Isbell patent and U. S. Patent No. Re. 25,740, reissued March 9, 1965, to P. E. Mayes et al. The Mayes patent was entitled "Log Periodic Backward Wave Antenna Array," and was, as indicated, a reissue of No. 3,108,280, applied for on September 30, 1960. B-T chose to subject itself to the jurisdiction of the court to

---

[3] The District Judge held:

"Those skilled in the art [of antenna design] at the time of the Isbell application knew (1) the log periodic method of designing frequency independent antennas, (2) that antenna arrays consisting of straight dipoles with progressively varied lengths and spacings exhibit greater broad band characteristics than those consisting of dipoles of equal length and spacing and, (3) that a dipole array type antenna having elements spaced less than ½ wavelength apart could be made unidirectional in radiation pattern by transposing the feeder line between elements and feeding the array at the end of the smallest element.

"It is the opinion of the Court that it would have been obvious to one ordinarily skilled in the art and wishing to design a frequency independent unidirectional antenna to combine these three old elements, all suggested by the prior art references previously discussed." 271 F. Supp., at 418–419.

defend its customer, and it filed an answer and counter-claim against the Foundation and its licensee, respondent JFD Electronics Corp., charging: (1) that both the Isbell and Mayes patents were invalid; (2) that if those patents were valid, the B-T antennas did not in-fringe either of them; (3) that the Foundation and JFD were guilty of unfair competition; (4) that the Founda-tion and JFD had violated the "anti-trust laws of the United States, including the Sherman and Clayton Acts, as amended"; and (5) that certain JFD antenna models infringed B-T's patent No. 3,259,904, "Antenna Having Combined Support and Lead-In," issued July 5, 1966.

Trial was again to the court, and on June 27, 1968, Judge Hoffman held that the Foundation's patents were valid and infringed, dismissed the unfair competition and antitrust charges, and found claim 5 of the B-T patent obvious and invalid. Before discussing the Isbell patent in detail, Judge Hoffman noted that it had been held invalid as obvious by Judge Stephenson in the *Winegard* litigation. He stated:

> "This court is, of course, free to decide the case at bar on the basis of the evidence before it. *Triplett* v. *Lowell*, 297 U. S. 638, 642 (1936). Although a patent has been adjudged invalid in another patent infringement action against other defendants, patent owners cannot be deprived 'of the right to show, if they can, that, as against defendants who have not previously been in court, the patent is valid and infringed.' *Aghnides* v. *Holden*, 22[6] F. 2d 949, 951 (7th Cir. 1955). On the basis of the evidence before it, this court disagrees with the conclusion reached in the *Winegard* case and finds both the Isbell patent and the Mayes et al. patent valid and enforceable patents." App. 73.

B-T appealed, and the Court of Appeals for the Seventh Circuit affirmed: (1) the findings that the Isbell patent was both valid and infringed by B-T's products; (2) the dismissal of B-T's unfair competition and antitrust counterclaims; and (3) the finding that claim 5 of the B-T patent was obvious. However, the Court of Appeals reversed the judgment insofar as Judge Hoffman had found the Mayes patent valid and enforceable, enjoined infringement thereof, and provided damages for such infringement. 422 F. 2d 769 (1970).

B-T sought certiorari, assigning the conflict between the Courts of Appeals for the Seventh and Eighth Circuits as to the validity of the Isbell patent as a primary reason for granting the writ.[4] We granted certiorari, 400 U. S. 864 (1970), and subsequently requested the parties to discuss the following additional issues not raised in the petition for review:

> "1. Should the holding of *Triplett* v. *Lowell*, 297 U. S. 638, that a determination of patent invalidity is not res judicata as against the patentee in subsequent litigation against a different defendant, be adhered to?
>
> "2. If not, does the determination of invalidity in the *Winegard* litigation bind the respondents in this case?"

I

In *Triplett* v. *Lowell*, 297 U. S. 638 (1936), this Court held:

> "Neither reason nor authority supports the contention that an adjudication adverse to any or all the claims of a patent precludes another suit upon the same claims against a different defendant. While

---

[4] See Petition for Certiorari 13. The grant of certiorari was not limited to the validity *vel non* of the Isbell patent.

the earlier decision may by comity be given great weight in a later litigation and thus persuade the court to render a like decree, it is not *res adjudicata* and may not be pleaded as a defense." 297 U. S., at 642.

The holding in *Triplett* has been at least gently criticized by some judges. In its opinion in the instant case, the Court of Appeals for the Seventh Circuit recognized the *Triplett* rule but nevertheless remarked that it "would seem sound judicial policy that the adjudication of [the question of the Isbell patent's validity] against the Foundation in one action where it was a party would provide a defense in any other action by the Foundation for infringement of the same patent." 422 F. 2d, at 772.[5]

---

[5] See also *Nickerson* v. *Kutschera,* 419 F. 2d 983, 984 (CA3 1969); *id.,* at 984–988 (Hastie, C. J., dissenting); *Nickerson* v. *Kutschera,* 390 F. 2d 812 (CA3 1968); *Tidewater Patent Development Co.* v. *Kitchen,* 371 F. 2d 1004, 1006 (CA4 1966); *Aghnides* v. *Holden,* 226 F. 2d 949, 951 (CA7 1955) (Schnackenberg, J., concurring); *Technograph Printed Circuits, Ltd.* v. *Packard Bell Electronics Corp.,* 290 F. Supp. 308, 317–319 (CD Cal. 1968) (holding that *Triplett* did not bar an infringement suit defendant's motion for summary judgment on *res judicata* grounds because (1) the statements as to mutuality of estoppel were dicta, and (2) the *Triplett* rule conflicted not only with more recent precedent in the estoppel area but also with the spirit of certain provisions of the Federal Rules of Civil Procedure, adopted six years after *Triplett* was decided); *Nickerson* v. *Pep Boys—Manny, Moe & Jack,* 247 F. Supp. 221 (Del. 1965). In the latter case, Judge Steel imposed an estoppel on facts somewhat similar to those before us. He analyzed the cases relied on in *Triplett, id.,* at 221–222, and concluded: "[f]rom the standpoint of the precedents [it cites], . . . Triplett v. Lowell does not rest upon too solid a foundation." *Id.,* at 222. Cf. *Technograph Printed Circuits, Ltd.* v. *United States,* 178 Ct. Cl. 543, 372 F. 2d 969 (1967); *Agrashell, Inc.* v. *Bernard Sirotta Co.,* 281 F. Supp. 704, 707–708 (EDNY 1968).

In its brief here, the Foundation urges that the rule of *Triplett* be maintained. Petitioner B-T's brief took the same position, stating that "[t]hough petitioners stand to gain by any such result, we cannot urge the destruction of a long-accepted safeguard for patentees merely for the expediency of victory." Brief for Petitioner 12. The Government, however, appearing as *amicus curiae*, urges that *Triplett* was based on uncritical acceptance of the doctrine of mutuality of estoppel, since limited significantly, and that the time has come to modify *Triplett* so that "claims of estoppel in patent cases [are] considered on a case by case basis, giving due weight to any factors which would point to an unfair or anomalous result from their allowance." Brief for the United States 7. The Government's position was spelled out in a brief filed more than a month after petitioner B-T filed its brief.

At oral argument the following colloquy occurred between the Court and counsel for B-T:

"Q. You're not asking for Triplett to be overruled?

"A. No, I'm not. I maintain that my brother here did have a right if there was a genuine new issue or some other interpretation of the [patent] claim or some interpretation of law in another circuit that's different than this Circuit, he had a right to try, under Triplett below, in another circuit.

"In this particular case, where we're stuck with substantially the same documentary evidence, where we were not able to produce [in the Seventh Circuit] even that modicum of expert testimony that existed in the Eighth Circuit, we think there may be as suggested by the Solicitor General, some reason for modification of that document [*sic*] in a case such as this." Tr. of Oral Arg. 7–8.

320

In light of this change of attitude from the time petitioner's brief was filed, we consider that the question of modifying *Triplett* is properly before us.[6]

## II

*Triplett* v. *Lowell* exemplified the judge-made doctrine of mutuality of estoppel, ordaining that unless both parties (or their privies) in a second action are bound by a judgment in a previous case, neither party (nor his privy) in the second action may use the prior judgment as deter-

---

[6] In rebuttal, counsel for petitioner made it clear that he was urging a "modification" of *Triplett*.

"Q. Well, has Petitioner finally decided to forego any request for reconsidering Triplett, entirely, or in any part? I understood you previously to say you would welcome a modification of it to some extent.

"A. Well, Your Honor, I think that is correct. The question . . . that was asked of us in our brief by this Court was should Triplett be overruled. That we answered no.

"Now the question is should there be modification. I think in all of law, when somebody is abusing it, . . . there are exceptions, and I think the Solicitor [General] is very close to [using] the idea that if in fact this were the same trial and they had the opportunity to present their witnesses before, and they didn't do it, that it seriously ought to be considered whether there ought to be an estoppel in a situation such as this." Tr. of Oral Arg. 64–65.

Rule 23 (1) (c) of the Rules of this Court states that "[o]nly the questions set forth in the petition or fairly comprised therein will be considered by the court." While this rule reflects many decisions stating that the Court is not required to decide questions not raised in a petition for certiorari, it does not limit our power to decide important questions not raised by the parties. The rule has certain well-recognized exceptions, particularly in cases arising in the federal courts. See R. Robertson & F. Kirkham, Jurisdiction of the Supreme Court of the United States § 418 (R. Wolfson & P. Kurland ed. 1951); R. Stern & E. Gressman, Supreme Court Practice § 6.37 (4th ed. 1969).

The instant case is not one where the parties have not briefed or argued a question that the Court nevertheless finds controlling under its authority to notice plain error. See Rule 40 (1) (d) (2),

minative of an issue in the second action. *Triplett* was decided in 1936. The opinion stated that "the rules of the common law applicable to successive litigations concerning the same subject matter" did not preclude "relitigation of the validity of a patent claim previously held invalid in a suit against a different defendant." 297 U. S., at 644. In *Bigelow* v. *Old Dominion Copper Co.,* 225 U. S. 111, 127 (1912), the Court had stated that it was "a principle of general elementary law that the estoppel of a judgment must be mutual." [7] The same

Rules of the Supreme Court of the United States; *Silber* v. *United States,* 370 U. S. 717 (1962). Rather, given what transpired at oral argument, the case is like *Moragne* v. *States Marine Lines, Inc.,* 398 U. S. 375 (1970). There, after granting certiorari, we asked the parties to brief and argue the continued validity of *The Harrisburg,* 119 U. S. 199 (1886). The petitioner, who would have stood to gain if *The Harrisburg* perished, argued that that decision should be overruled, but strongly maintained that it was unnecessary to do so in order to afford her relief. Respondent, of course, argued that *The Harrisburg* should be left intact. The United States, appearing as *amicus curiae,* urged the Court to overrule *The Harrisburg,* and that was the result.

Moreover, in a landmark decision involving an important question of judicial administration in the federal courts, this Court overruled a prior decision of many years' standing although the parties did not urge such a holding in their briefs. *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, 66, 68–69 (1938). See also R. Jackson, The Struggle for Judicial Supremacy 281–282 (1949). While the question here is hardly of comparable importance, it is a significant one, in the same general field, and it has been fully briefed and argued by the parties and *amici.* See *Moragne,* 398 U. S., at 378–380, n. 1; cf. *NLRB* v. *Pittsburgh S. S. Co.,* 337 U. S. 656, 661–662 (1949).

[7] See also 225 U. S., at 130–131; *Stone* v. *Farmers' Bank,* 174 U. S. 409 (1899); *Keokuk & W. R. Co.* v. *Missouri,* 152 U. S. 301, 317 (1894); *Litchfield* v. *Goodnow,* 123 U. S. 549, 552 (1887). *Bigelow* also spent some time discussing one of the many exceptions to the mutuality requirement, 225 U. S., at 127–128. These "exceptions" are described in Moore & Currier, Mutuality and Conclusiveness of Judgments, 35 Tul. L. Rev. 301, 311–329 (1961), and Note, 35 Geo. Wash. L. Rev. 1010, 1015–1017 (1967).

rule was reflected in the Restatement of Judgments. Restatement of Judgments § 93 (1942).[8]

But even at the time *Triplett* was decided, and certainly by the time the Restatement was published, the mutuality rule had been under fire. Courts had discarded the requirement of mutuality and held that only the party against whom the plea of estoppel was asserted had to have been in privity with a party in the prior action.[9] As Judge Friendly has noted, Bentham had at-

---

[8] Under the topic head "Persons not Parties or Privies," § 93 provides:

"General Rule. Except as stated in §§ 94–111, a person who is not a party or privy to a party to an action in which a valid judgment other than a judgment in rem is rendered (a) cannot directly or collaterally attack the judgment, and (b) is not bound by or entitled to claim the benefits of an adjudication upon any matter decided in the action."

Illustration 10 of the Restatement stated the essentials of the *Triplett* rule:

"A brings an action against B for infringement of a patent. B defends on the ground that the alleged patent was void and obtains judgment. A brings an action for infringement of the same patent against C who seeks to interpose the judgment in favor of B as res judicata, but setting up no relation with B. On demurrer, judgment should be for A."

[9] *Atkinson* v. *White*, 60 Me. 396, 398 (1872); *Jenkins* v. *Atlantic Coast Line R. Co.*, 89 S. C. 408, 71 S. E. 1010 (1911); *United States* v. *Wexler*, 8 F. 2d 880 (EDNY 1925); *Brobston* v. *Darby Borough*, 290 Pa. 331, 138 A. 849 (1927); *Eagle, Star & British Dominions Ins. Co.* v. *Heller*, 149 Va. 82, 140 S. E. 314 (1927); *Liberty Mutual Ins. Co.* v. *George Colon & Co.*, 260 N. Y. 305, 183 N. E. 506 (1932); *Coca Cola Co.* v. *Pepsi-Cola Co.*, 36 Del. 124, 172 A. 260 (Super. Ct. 1934); see also *Good Health Dairy Products Corp.* v. *Emery*, 275 N. Y. 14, 19, 9 N. E. 2d 758, 760 (1937). In the latter case, the New York Court of Appeals stated:

"It is true that [the owner of the automobile], not being a party to the earlier actions, and not having had a chance to litigate her rights and liabilities, is not bound by the judgments entered therein,

tacked the doctrine "as destitute of any semblance of reason, and as 'a maxim which one would suppose to have found its way from the gaming-table to the bench' . . . ." *Zdanok* v. *Glidden Co.*, 327 F. 2d 944, 954 (CA2 1964), cert. denied, 377 U. S. 934 (1964) (quoting 3 J. Bentham, Rationale of Judicial Evidence 579 (1827), reprinted in 7 Works of Jeremy Bentham 171 (J. Bowring ed. 1843)). There was also ferment in scholarly quarters.[10]

Building upon the authority cited above, the California Supreme Court, in *Bernhard* v. *Bank of America Nat. Trust & Savings Assn.*, 19 Cal. 2d 807, 122 P. 2d 892 (1942), unanimously rejected the doctrine of mutuality, stating that there was "no compelling reason . . . for requiring that the party asserting the plea of res judicata must have been a party, or in privity with a party, to the earlier litigation." *Id.*, at 812, 122 P. 2d, at 894. Justice Traynor's opinion, handed down the same year the Restatement was published, listed criteria since employed by many courts in many contexts:

> "In determining the validity of a plea of res judicata three questions are pertinent: Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in

but, on the other hand, that is not a valid ground for allowing the plaintiffs to litigate anew the precise questions which were decided against them in a case in which they were parties."

[10] The principle was attacked in Cox, Res Adjudicata: Who Entitled to Plead, 9 Va. L. Rev. (n. s.) 241, 245–247 (1923); Comment, 35 Yale L. J. 607, 610 (1926); Comment, 29 Ill. L. Rev. 93, 94 (1934); Note, 18 N. Y. U. L. Q. Rev. 565, 570–573 (1941); Recent Decisions, 27 Va. L. Rev. 955 (1941); Recent Cases, 15 U. Cin. L. Rev. 349 (1941). Cf. von Moschzisker, Res Judicata, 38 Yale L. J. 299, 303 (1929); Comment, 23 Ore. L. Rev. 273 (1944); Recent Cases, 54 Harv. L. Rev. 889 (1941).

privity with a party to the prior adjudication?" 19 Cal. 2d, at 813, 122 P. 2d, at 895.

Although the force of the mutuality rule had been diminished by exceptions and *Bernhard* itself might easily have been brought within one of the established exceptions, "Justice Traynor chose instead to extirpate the mutuality requirement and put it to the torch." Currie, Civil Procedure: The Tempest Brews, 53 Calif. L. Rev. 25, 26 (1965).

*Bernhard* had significant impact. Many state and federal courts rejected the mutuality requirement, especially where the prior judgment was invoked defensively in a second action against a plaintiff bringing suit on an issue he litigated and lost as plaintiff in a prior action.[11] The trend has been apparent in federal-question cases.[12] The federal courts found *Bernhard* persuasive. As Judge Hastie stated more than 20 years ago:

"This second effort to prove negligence is comprehended by the generally accepted precept that a party who has had one fair and full opportunity to prove a claim and has failed in that effort, should not be permitted to go to trial on the merits of that claim a second time. Both orderliness and reasonable time saving in judicial administration require that

---

[11] For discussion of the "offensive-defensive" distinction, see generally Vestal, Preclusion/Res Judicata Variables: Parties, 50 Iowa L. Rev. 27, 43–76 (1964); Note, 35 Geo. Wash. L. Rev. 1010 (1967). See also Currie, Mutuality of Collateral Estoppel: Limits of the *Bernhard* Doctrine, 9 Stan. L. Rev. 281 (1957); Note, 68 Col. L. Rev. 1590 (1968); Note, 52 Cornell L. Q. 724 (1967).

[12] In federal-question cases, the law applied is federal law. This Court has noted, "It has been held in non-diversity cases, since *Erie R. Co.* v. *Tompkins,* that the federal courts will apply their own rule of *res judicata." Heiser* v. *Woodruff,* 327 U. S. 726, 733 (1946). See also Vestal, Res Judicata/Preclusion by Judgment: The Law Applied in Federal Courts, 66 Mich. L. Rev. 1723, 1739, 1745 (1968); *id.,* cases cited at 1739–1740, nn. 62–64.

this be so unless some overriding consideration of fairness to a litigant dictates a different result in the circumstances of a particular case.

"The countervailing consideration urged here is lack of mutuality of estoppel. In the present suit [the plaintiff] would not have been permitted to take advantage of an earlier affirmative finding of negligence, had such finding been made in [his first suit against a different defendant]. For that reason he argues that he should not be bound by a contrary finding in that case. But a finding of negligence in the [plaintiff's first suit] would not have been binding against the [defendant in a second suit] because [that defendant] had no opportunity to contest the issue there. The finding of no negligence on the other hand was made after full opportunity to [plaintiff] on his own election to prove the very matter which he now urges a second time. Thus, no unfairness results here from estoppel which is not mutual. In reality the argument of [plaintiff] is merely that the application of *res judicata* in this case makes the law asymmetrical. But the achievement of substantial justice rather than symmetry is the measure of the fairness of the rules of *res judicata.*" *Bruszewski* v. *United States,* 181 F. 2d 419, 421 (CA3 1950), cert. denied, 340 U. S. 865 (1950).

Many federal courts, exercising both federal question and diversity jurisdiction, are in accord unless in a diversity case bound to apply a conflicting state rule requiring mutuality.[13]

---

[13] See, *e. g., Lober* v. *Moore,* 135 U. S. App. D. C. 146, 417 F. 2d 714 (1969); *Provident Tradesmens Bank & Trust Co.* v. *Lumbermens Mutual Cas. Co.,* 411 F. 2d 88, 92–95 (CA3 1969); *Seguros Tepeyac, S. A., Compania Mexicana* v. *Jernigan,* 410 F. 2d 718,

326

Of course, transformation of estoppel law was neither instantaneous nor universal. As late as 1961, eminent authority stated that "[m]ost state courts recognize and apply the doctrine of mutuality, subject to certain exceptions . . . . And the same is true of federal courts, when free to apply their own doctrine." Moore & Currier, Mutuality and Conclusiveness of Judgments, 35 Tul. L. Rev. 301, 304 (1961) (footnotes omitted); see also, 1B J. Moore, Federal Practice ¶ 0.412 [1], pp. 1803–1804 (1965). However, in 1970 Professor Moore noted that "the trend in the federal courts is away from the rigid requirements of mutuality advocated herein." *Id.*, Supp. 1970, at 53. The same trend is evident in the state courts.[14]

726–728 (CA5 1969), cert. denied, 396 U. S. 905 (1969); *Cauefield* v. *Fidelity & Cas. Co. of New York*, 378 F. 2d 876, 878–879 (CA5), cert. denied, 389 U. S. 1009 (1967); *Graves* v. *Associated Transport, Inc.*, 344 F. 2d 894 (CA4 1965); *Kurlan* v. *Commissioner*, 343 F. 2d 625, 628–629 (CA2 1965); *United States* v. *United Air Lines*, 216 F. Supp. 709, 725–730 (ED Wash., Nev. 1962), aff'd as to *res judicata, sub nom. United Air Lines* v. *Wiener*, 335 F. 2d 379, 404–405 (CA9 1964); *Zdanok* v. *Glidden Co., supra*, at 954–956; *Davis* v. *McKinnon & Mooney*, 266 F. 2d 870, 872–873 (CA6 1959); *People* v. *Ohio Cas. Ins. Co.*, 232 F. 2d 474, 477 (CA10 1956); *Adriaanse* v. *United States*, 184 F. 2d 968 (CA2 1950), cert. denied, 340 U. S. 932 (1951); *Maryland* v. *Capital Airlines, Inc.*, 267 F. Supp. 298, 302–305 (Md. 1967); *Mathews* v. *New York Racing Assn., Inc.*, 193 F. Supp. 293 (SDNY 1961); *Eisel* v. *Columbia Packing Co.*, 181 F. Supp. 298 (Mass. 1960).

[14] See cases cited n. 9, *supra*. A more recent canvass of cases is presented in Note, 35 Geo. Wash. L. Rev. 1010 (1967).

The Supreme Court of Oregon was the most recent state court to adopt *Bernhard*. *Bahler* v. *Fletcher*, 257 Ore. 1, 474 P. 2d 329 (1970); see also *Pennington* v. *Snow*, 471 P. 2d 370, 376–377 (Alaska 1970); *Ellis* v. *Crockett*, 51 Haw. 45, 56, 451 P. 2d 814, 822 (1969); *Pat Perusse Realty Co.* v. *Lingo*, 249 Md. 33, 238 A. 2d 100 (1968); *Sanderson* v. *Balfour*, 109 N. H. 213, 247 A. 2d 185 (1968); *Home Owners Fed. Savings & Loan Assn.* v. *Northwestern Fire & Marine Ins. Co.*, 354 Mass. 448, 451–455, 238 N. E. 2d 55, 57–59 (1968) (approving use of *Bernhard* by a defendant against a previously

Undeniably, the court-produced doctrine of mutuality of estoppel is undergoing fundamental change in the common-law tradition. In its pristine formulation, an increasing number of courts have rejected the principle as unsound. Nor is it irrelevant that the abrogation of mutuality has been accompanied by other developments—such as expansion of the definition of "claim" in bar and merger contexts [15] and expansion of the preclusive effects afforded criminal judgments in civil litigation [16]—which enhance the capabilities of the courts to deal with some issues swiftly but fairly.

Obviously, these mutations in estoppel doctrine are not before us for wholesale approval or rejection. But at the very least they counsel us to re-examine whether mutuality of estoppel is a viable rule where a patentee seeks to relitigate the validity of a patent once a federal court has declared it to be invalid.[17]

---

losing plaintiff); *DeWitt, Inc.* v. *Hall,* 19 N. Y. 2d 141, 225 N. E. 2d 195 (1967); *Lustik* v. *Rankila,* 269 Minn. 515, 131 N. W. 2d 741 (1964); *Lucas* v. *Velikanje,* 2 Wash. App. 888, 471 P. 2d 103 (1970) (lower state appellate court held that State Supreme Court would follow *Bernhard* in an appropriate case); *Howell* v. *Vito's Trucking & Excavating Co.,* 20 Mich. App. 140, 173 N. W. 2d 777 (1969); *Desmond* v. *Kramer,* 96 N. J. Super. 96, 232 A. 2d 470 (1967); *Lynch* v. *Chicago Transit Authority,* 62 Ill. App. 2d 220, 210 N. E. 2d 792 (1965).

[15] See F. James, Civil Procedure 552–573 (1965); Vestal, Res Judicata/Preclusion by Judgment: The Law Applied in Federal Courts, 66 Mich. L. Rev. 1723, 1724 (1968).

[16] See *Moore* v. *United States,* 360 F. 2d 353 (CA4 1965); *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.,* 58 Cal. 2d 601, 375 P. 2d 439 (1962); *Eagle, Star & British Dominions Ins. Co.* v. *Heller,* 149 Va. 82, 140 S. E. 314 (1927); Vestal, *supra,* n. 15, at 1724; Vestal & Coughenour, Preclusion/Res Judicata Variables: Criminal Prosecutions, 19 Vand. L. Rev. 683 (1966).

[17] We agree with the Government that Congress has not approved the *Triplett* rule, either by its failure to modify that rule over the years, see *Boys Markets, Inc.* v. *Retail Clerks Union,* 398 U. S. 235, 241–242 (1970); *Girouard* v. *United States,* 328 U. S. 61, 69–70

## III

The cases and authorities discussed above connect erosion of the mutuality requirement to the goal of limiting relitigation of issues where that can be achieved without compromising fairness in particular cases. The courts have often discarded the rule while commenting on crowded dockets and long delays preceding trial. Authorities differ on whether the public interest in efficient judicial administration is a sufficient ground in and of itself for abandoning mutuality,[18] but it is clear that more than crowded dockets is involved. The broader question is whether it is any longer tenable to afford a litigant more than one full and fair opportunity for judicial resolution of the same issue. The question in these terms includes as part of the calculus the effect on judicial administration, but it also encompasses the concern exemplified by Bentham's reference to the gaming table in his attack on the principle of mutuality of estop-

(1946); *Helvering* v. *Hallock*, 309 U. S. 106, 119–120 (1940); by anything that transpired during the preparation for and accomplishment of the 1952 revision of the Patent Code; or because *in rem* invalidity provisions, see n. 34, *infra*, have disappeared from recent proposals for reform of the patent statute.

[18] Professors Moore and Currier point out that one of the underpinnings of the general concept of *res judicata* is the prevention of harassment of some litigants by the repeated assertion of the same or different claims against them by others, and that this problem is simply not present where the person asserting an estoppel was not a party (or privy to a party) in the earlier suit. They then argue that "the doctrine of judicial finality is not a catchpenny contrivance to dispose of cases merely for the sake of disposition and clear up dockets in that manner." Moore & Currier, *supra*, n. 7, at 308. On the other hand, Professor Vestal argues that "[j]udges, overwhelmed by docket loads, are looking for devices to expedite their work. Preclusion offers an opportunity to eliminate litigation which is not necessary or desirable." Vestal, *supra*, n. 15, at 1724.

pel. In any lawsuit where a defendant, because of the mutuality principle, is forced to present a complete defense on the merits to a claim which the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources. To the extent the defendant in the second suit may not win by asserting, without contradiction, that the plaintiff had fully and fairly, but unsuccessfully, litigated the same claim in the prior suit, the defendant's time and money are diverted from alternative uses—productive or otherwise—to relitigation of a decided issue. And, still assuming that the issue was resolved correctly in the first suit, there is reason to be concerned about the plaintiff's allocation of resources. Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or "a lack of discipline and of disinterestedness on the part of the lower courts, hardly a worthy or wise basis for fashioning rules of procedure." *Kerotest Mfg. Co. v. C-O-Two Co.,* 342 U. S. 180, 185 (1952). Although neither judges, the parties, nor the adversary system performs perfectly in all cases, the requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard.

Some litigants—those who never appeared in a prior action—may not be collaterally estopped without litigating the issue. They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position. See *Hansberry v. Lee,* 311 U. S. 32, 40 (1940); *Bernhard,* 19 Cal. 2d, at 811, 122 P. 2d, at 894. Also, the authorities have been more willing to permit a defendant in a second suit to invoke an estoppel against a plaintiff who lost on the same claim in an earlier suit than they have been to allow a plaintiff

in the second suit to use offensively a judgment obtained by a different plaintiff in a prior suit against the same defendant.[19]  But the case before us involves neither due process nor "offensive use" questions.  Rather, it depends on the considerations weighing for and against permitting a patent holder to sue on his patent after it has once been held invalid following opportunity for full and fair trial.

There are several components of the problem.  First, we analyze the proposed abrogation or modification of the *Triplett* rule in terms of those considerations relevant to the patent system.  Second, we deal broadly with the economic costs of continued adherence to *Triplett*. Finally, we explore the nature of the burden, if any, that permitting patentees to relitigate patents once held invalid imposes on the federal courts.

## A

Starting with the premise that the statutes creating the patent system, expressly sanctioned by the Constitution,[20] represent an affirmative policy choice by Congress to reward inventors, respondents extrapolate a special public interest in sustaining "good" patents and characterize patent litigation as so technical and difficult as to present unusual potential for unsound adjudications. Although *Triplett* made no such argument in support of its holding, that rule, offering the unrestricted right to

---

[19] But see *United States* v. *United Air Lines, supra; Zdanok* v. *Glidden Co., supra;* Currie, Civil Procedure: The Tempest Brews, 53 Calif. L. Rev. 25, 28–37 (1965); Vestal, 50 Iowa L. Rev., at 55–59; cf. Semmel, Collateral Estoppel, Mutuality and Joinder of Parties, 68 Col. L. Rev. 1457 (1968); Weinstein, Revision of Procedure: Some Problems in Class Actions, 9 Buffalo L. Rev. 433, 448–454 (1960); Note, 35 Geo. Wash. L. Rev. 1010 (1967).

[20] U. S. Const., Art. I, § 8, cl. 8.

relitigate patent validity, is thus deemed an essential safeguard against improvident judgments of invalidity.[21]

We fully accept congressional judgment to reward inventors through the patent system. We are also aware that some courts have frankly stated that patent litigation can present issues so complex that legal minds, without appropriate grounding in science and technology, may have difficulty in reaching decision.[22] On the other hand, this Court has observed that issues of nonobviousness under 35 U. S. C. § 103 present difficulties "comparable to those encountered daily by the courts in such frames of reference as negligence and scienter, and should be amenable to a case-by-case development." *Graham* v. *John Deere Co.*, 383 U. S., at 18. But assuming a patent case so difficult as to provoke a frank admission of judicial uncertainty, one might ask what reason there is to expect that a second district judge or court of

---

[21] The Court of Claims has stated:

"For patent litigation there is a special reason why relitigation is not automatically banned as needless or redundant, and why error should not be perpetuated without inquiry. Patent validity raises issues significant to the public as well as to the named parties. *Sinclair & Carroll Co.* v. *Interchemical Corp.*, 325 U. S. 327, 330 (1945). It is just as important that a good patent be ultimately upheld as that a bad one be definitively stricken. At the same time it must be remembered that the issue of patent validity is often 'as fugitive, impalpable, wayward, and vague a phantom as exists in the whole paraphernalia of legal concepts. . . . If there be an issue more troublesome, or more apt for litigation than this, we are not aware of it.' *Harries* v. *Air King Products Co.*, supra, 183 F. 2d at 162 (per L. Hand, C. J.). Because of the intrinsic nature of the subject, the first decision can be quite wrong, or derived from an insufficient record or presentation." *Technograph Printed Circuits*, 178 Ct. Cl., at 556, 372 F. 2d, at 977–978.

[22] See *Nyyssonen* v. *Bendix Corp.*, 342 F. 2d 531, 532 (CA1 1965); *Harries* v. *Air King Products Co.*, 183 F. 2d 158, 164 (CA2 1950); *Parke-Davis & Co.* v. *H. K. Mulford Co.*, 189 F. 95, 115 (SDNY 1911).

appeals would be able to decide the issue more accurately. Moreover, as *Graham* also indicates, Congress has from the outset chosen to impose broad criteria of patentability while lodging in the federal courts final authority to decide that question. 383 U. S., at 10. In any event it cannot be sensibly contended that all issues concerning patent validity are so complex and unyielding. Nonobviousness itself is not always difficult to perceive and decide and other questions on which patentability depends are more often than not no more difficult than those encountered in the usual nonpatent case.[23]

Even conceding the extreme intricacy of some patent cases, we should keep firmly in mind that we are considering the situation where the patentee was plaintiff in the prior suit and chose to litigate at that time and place. Presumably he was prepared to litigate and to litigate to the finish against the defendant there involved. Patent litigation characteristically proceeds with some deliberation and, with the avenues for discovery available under the present rules of procedure, there is no reason to suppose that plaintiff patentees would face either surprise or unusual difficulties in getting all relevant and probative evidence before the court in the first litigation.

Moreover, we do not suggest, without legislative guidance, that a plea of estoppel by an infringement or

---

[23] The *Triplett* rule apparently operates to defeat a plea of estoppel where a patent has been declared invalid under provisions other than 35 U. S. C. § 103, the section defining nonobviousness of the subject matter as a prerequisite to patentability and giving rise to many technical issues which it is claimed courts are poorly equipped to judge. Under §§ 101 and 102 of the 1952 Act, patentability is also conditioned on novelty and utility. Some subsections of § 102—each of which can result in the loss of a patent—involve completely nontechnical issues. Yet the breadth of *Triplett* would force defendants in repetitious suits on a patent invalidated on one of these grounds to repeat proof that may be simple of understanding yet expensive to produce.

royalty suit defendant must automatically be accepted once the defendant in support of his plea identifies the issue in suit as the identical question finally decided against the patentee or one of his privies in previous litigation.[24] Rather, the patentee-plaintiff must be permitted to demonstrate, if he can, that he did not have "a fair opportunity procedurally, substantively and evidentially to pursue his claim the first time." *Eisel* v. *Columbia Packing Co.*, 181 F. Supp. 298, 301 (Mass. 1960). This element in the estoppel decision will comprehend, we believe, the important concerns about the complexity of patent litigation and the posited hazard that the prior proceedings were seriously defective.

Determining whether a patentee has had a full and fair chance to litigate the validity of his patent in an earlier case is of necessity not a simple matter. In addition to the considerations of choice of forum and incentive to litigate mentioned above,[25] certain other factors immediately emerge. For example, if the issue is nonobviousness, appropriate inquiries would be whether the first · validity determination purported to employ the standards announced in *Graham* v. *John Deere Co., supra;* whether the opinions filed by the District Court and the reviewing court, if any, indicate that the prior case was one of those relatively rare instances where the courts wholly failed to grasp the technical subject matter and issues in suit; and whether without fault of his own the patentee was deprived of crucial evidence or witnesses in the first litigation.[26] But as so often is the case, no one

---

[24] See nn. 34–35, *infra.*

[25] See *Zdanok* v. *Glidden Co.*, 327 F. 2d, at 956; *Teitelbaum Furs, Inc.*, 58 Cal. 2d, at 606–607, 375 P. 2d, at 441; cf. *Berner* v. *British Commonwealth Pacific Airlines, Ltd.*, 346 F. 2d 532, 540–541 (CA2 1965).

[26] It has been argued that one factor to be considered in deciding whether to allow a plea of estoppel in a second action is the possibility that the judgment in the first action was a compromise verdict

set of facts, no one collection of words or phrases, will provide an automatic formula for proper rulings on estoppel pleas. In the end, decision will necessarily rest on the trial courts' sense of justice and equity.

We are not persuaded, therefore, that the *Triplett* rule, as it was formulated, is essential to effectuate the purposes of the patent system or is an indispensable or even an effective safeguard against faulty trials and judgments. Whatever legitimate concern there may be about the intricacies of some patent suits, it is insufficient in and of itself to justify patentees relitigating validity issues as long as new defendants are available. This is especially true if the court in the second litigation must decide in a principled way whether or not it is just and equitable to allow the plea of estoppel in the case before it.

## B

An examination of the economic consequences of continued adherence to *Triplett* has two branches. Both, however, begin with the acknowledged fact that patent litigation is a very costly process. Judge Frank observed in 1942 that "the expense of defending a patent suit is often staggering to the small businessman." *Picard* v. *United Aircraft Corp.*, 128 F. 2d 632, 641 (CA2 1942) (concurring opinion). In *Lear, Inc.* v. *Adkins*, 395 U. S. 653, 669 (1969), we noted that one of the benefits accruing to a businessman accepting a license from a patentee who was threatening him with a suit was avoiding "the necessity of defending an expensive infringement action during the period when he may be least able to afford one." Similarly, in replying to claims by alleged

---

by a jury. This problem has not, however, been deemed sufficient to preclude abrogation of the mutuality principle in other contexts. Nor would it appear to be a significant consideration in deciding when to sustain a plea of estoppel in patent litigation, since most patent cases are tried to the court. See n. 30, *infra*.

infringers that they have been guilty of laches in suing on their patents, patentees have claimed that the expense of litigating forced them to postpone bringing legal action. See, *e. g., Baker Mfg. Co.* v. *Whitewater Mfg. Co.,* 430 F. 2d 1008, 1014–1015 (CA7 1970). In recent congressional hearings on revision of the patent laws, a lawyer-businessman discussing a proposal of the American Society of Inventors for government-sponsored insurance to provide funds for litigation to individual inventors holding nonassigned patents stated: "We are advised that the average cost for litigating a patent is about $50,000." [27]

This statement, and arguments such as the one made in *Baker Mfg., supra,* must be assessed in light of the fact that they are advanced by patentees contemplating action as plaintiffs, and patentees are heavily favored as a class of litigants by the patent statute. Section 282 of the Patent Code provides, in pertinent part:

> "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

If a patentee's expense is high though he enjoys the benefits of the presumption of validity, the defendant in an infringement suit will have even higher costs as he both introduces proof to overcome the presumption and attempts to rebut whatever proof the patentee offers to bolster the claims. In testimony before the Senate subcommittee considering patent law revision in 1967, a member of the President's Commission on the Patent

---

[27] Hearings on Patent Law Revision before the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 90th Cong., 2d Sess., 616 (1968) (statement of Henry J. Cappello, President, Space Recovery Research Center, Inc., and consultant on patent policy for the National Small Business Association) (hereafter 1968 Senate Hearings).

System discussed the financial burden looming before one charged as a defendant in a complex infringement action in terms of amounts that sometimes run to "hundreds of thousands of dollars." [28]

Statistics tend to bear this out. Patent suits constitute between 1% and 2% of the total number of civil cases filed each year in the District Courts.[29] Despite this relatively small figure, and notwithstanding the overwhelming tendency to try these suits without juries,[30]

[28] Hearings on Patent Law Revision before the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., 103 (1967) (statement of James W. Birkenstock, Vice President, I. B. M. Corp.) (hereafter 1967 Senate Hearings).

It is significant that the President's Commission identified as one of its primary objectives "reduc[ing] the expense of obtaining and litigating a patent." "To Promote the Progress of . . . Useful Arts" In an Age of Exploding Technology, Report of the President's Commission on the Patent System 4 (1966) (hereafter Commission Report). Judge Rich of the Court of Customs and Patent Appeals, whose public reaction to the Commission Report was mixed, did agree that "[l]itigation being as expensive as it is, no one embarks upon it lightly." Rich, The Proposed Patent Legislation: Some Comments, 35 Geo. Wash. L. Rev. 641, 644 (1967).

[29] In fiscal 1968, 71,449 civil actions were filed in the federal district courts, 857 of which were patent suits. In fiscal 1969, 77,193 civil suits were filed; 889 involved patents. In fiscal 1970, 87,321 civil suits were initiated, 1,023 of which involved patents. Annual Report of the Director of the Administrative Office of the United States Courts for the Fiscal Year Ended June 30, 1968, Table C–2 (1969); Annual Report of the Director of the Administrative Office of the United States Courts for the Fiscal Year Ended June 30, 1969, Table C–2 (1970); Annual Report of the Director of the Administrative Office of the United States Courts for the Fiscal Year Ended June 30, 1970, Table C–2 (temp. ed. 1971) (hereafter Annual Report 1968, etc.).

[30] Most patent cases are tried to the court. In fiscal 1968, 1969, and 1970, the total number of patent cases going to trial and the number of patent cases going to juries were, respectively: 1968— 131, 2; 1969—132, 8; and 1970—119, 3. Annual Reports 1968-1970, Table C–8.

patent cases that go to trial seem to take an inordinate amount of trial time.[31]   While in 1961 a Senate staff report stated that the "typical patent trial, without a jury, was completed in 3 days or less,"[32] recent figures indicate that this description of the time required is today

---

[31] The table below compares patent cases tried to the court during fiscal 1968, 1969, and 1970 with all nonjury civil cases tried during the same years.  It reveals several facts: (1) something over 90% of all civil litigation is concluded within three full trial days, but less than half the patent cases are concluded in such a period of time; (2) whereas between 1.2% and 1.7% of civil nonjury trials in general require 10 or more trial days, between 14.7% and 19% of the patent cases tried to the court require 10 or more days to conclude; and (3), while the three-year trend in the district courts appears to be toward more expeditious handling of civil cases tried without a jury in terms of an annual increase in the percentage of cases concluded in three trial days or less and an overall decrease in the percentage of cases requiring 10 or more days, the trends in patent litigation are exactly contrary.  .

| | Fiscal 1968 | Fiscal 1969 | Fiscal 1970 |
|---|---|---|---|
| Total civil non-jury trials.... | 5,478 | 5,619 | 6,078 |
| Total patent non-jury trials.. | 129 | 124 | 116 |
| Approx. % of non-jury civil cases concluded in 3 trial days or less.............. | 92.2 | 92.8 | 93.1 |
| Approx. % of non-jury patent cases concluded in 3 trial day or less.............. | 49.6 | 46.8 | 44.0 |
| Approx. % of non-jury civil trials taking 10 or more trial days to conclude.......... | 1.7 | 1.2 | 1.3 |
| Approx. % of non-jury patent trials taking 10 or more trial days to conclude...... | 14.7 | 15.3 | 19 |

Source:  Annual Reports 1968–1970, Table C–8.

[32] An Analysis of Patent Litigation Statistics, Staff Report of the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 86th Cong., 2d Sess., 2 (1961) (Committee Print) (hereafter 1961 Staff Report).

inaccurate.[33]   And time—particularly trial time—is un-questionably expensive.

As stated at the outset of this section, the expense of patent litigation has two principal consequences if the *Triplett* rule is maintained.   First, assuming that a per-fectly sound judgment of invalidity has been rendered in an earlier suit involving the patentee, a second infringe-ment action raising the same issue and involving much of the same proof has a high cost to the individual parties. The patentee is expending funds on litigation to protect a patent which is by hypothesis invalid.   These moneys could be put to better use, such as further research and development.   The alleged infringer—operating as he must against the presumption of validity—is forced to divert substantial funds to litigation that is wasteful.

The second major economic consideration is far more significant.   Under *Triplett,* only the comity restraints flowing from an adverse prior judgment operate to limit the patentee's right to sue different defendants on the same patent.   In each successive suit the patentee enjoys the statutory presumption of validity, and so may easily put the alleged infringer to his expensive proof.   As a consequence, prospective defendants will often decide that paying royalties under a license or other settlement is preferable to the costly burden of challenging the patent.

---

[33] See n. 31, *supra.*   The 1961 Staff Report also noted that during the "fiscal years 1954–58 . . . nine [patent] trials consumed 20 or more days." *Id.,* at 2.   Further examination of recent figures from the Administrative Office of the United States Courts indi-cates that this statement would also be of questionable validity today.   In fiscal 1968, 38 civil trials that took 20 days or more to try were terminated.   Of these, five, or about 13%, were patent cases.   The comparable figures for fiscal 1969 are 28 civil trials requiring 20 or more days concluded, seven (25%) of which were patent cases.   In fiscal 1970, 32 such civil cases were termi-nated; seven, or about 22%, of these suits were patent cases. Annual Reports, 1968–1970, Table C–9.

The problem has surfaced and drawn comment before. See, *e. g., Nickerson* v. *Kutschera*, 419 F. 2d 983, 988 n. 4 (CA3 1969) (dissenting opinion); *Picard* v. *United Aircraft Corp.*, 128 F. 2d, at 641–642 (concurring opinion). In 1961, the Senate Judiciary Subcommittee on Patents, Trademarks, and Copyrights published a staff study of infringement and declaratory judgment actions terminated in the district courts and courts of appeals during 1949–1958; the report showed 62 actions commenced after an earlier determination that the patent in suit was not valid. It also noted that the "vast majority" of such suits were terminated without a second adjudication of validity. 1961 Staff Report 19. It is apparent that termination without a second adjudication of validity was the result of a licensing agreement or some other settlement between the parties to the second suit. It is also important to recognize that this study covered only cases *filed* and terminated; there were undoubtedly more suits that were threatened but not filed, because the threat alone was sufficient to forestall a challenge to the patent.

This is borne out by the observations of the President's Commission on the Patent System and recent testimony on proposals for changes in the patent laws. Motivated by the economic consequences of repetitious patent litigation, the Commission proposed:

> "A final federal judicial determination declaring a patent claim invalid shall be *in rem,* and the cancellation of such claim shall be indicated on all patent copies subsequently distributed by the Patent Office." Recommendation XXIII, Commission Report 38.

The Commission stressed the competitive disadvantage imposed on an alleged infringer who is unable or unwilling to defend a suit on the patent, stating also that a "patentee, having been afforded the opportunity to

exhaust his remedy of appeal from a holding of invalidity, has had his 'day in court' and should not be allowed to harass others on the basis of an invalid claim. There are few, if any, logical grounds for permitting him to clutter crowded court dockets and to subject others to costly litigation." *Id.*, at 39. The report provoked the introduction of several bills to effect broad changes in the patent system. Some bills contained provisions imposing an inflexible rule of *in rem* invalidity operating against a patentee regardless of the character of the litigation in which his patent was first declared invalid. See S. 1042, 90th Cong., 1st Sess., § 294 (1967), and H. R. 5924, 90th Cong., 1st Sess., § 294 (1967); [34] cf.

---

[34] "Estoppel and cancellation

"(a) In any action in a Federal court in which the issue of the validity or scope of a claim of a patent is properly before the court, and the owner of the patent as shown by the records of the Patent Office is a party or has been given notice as provided in subsection (c) of this section, a final adjudication, from which no appeal has been or can be taken, limiting the scope of the claim or holding it to be invalid, shall constitute an estoppel against the patentee, and those in privity with him, in any subsequent Federal action, and may constitute an estoppel in such other Federal actions as the latter court may determine, involving such patent. Within thirty days of such adjudication the clerk of the court shall transmit notice thereof to the Commissioner, who shall place the same in the public records of the Patent Office pertaining to such patent, and endorse notice on all copies of the patent thereafter distributed by the Patent Office that the patent is subject to such adjudication.

"(b) In any action as set forth in subsection (a) of this section, upon a final adjudication from which no appeal has been or can be taken that a claim of the patent is invalid, the court may order cancellation of such claim from the patent. Such order shall be included in the notice to the Commissioner specified in subsection (a) of this section, and the notice of cancellation of a claim shall be published by the Commissioner and endorsed on all copies of the patent thereafter distributed by the Patent Office.

"(c) In any action in a Federal court in which the validity or scope of a claim of a patent is drawn into question, the owner of the patent, as shown by the records of the Patent Office, shall

S. 3892, 90th Cong., 2d Sess., § 294 (1968).[35] Hearings were held in both Houses on these and other patent revision bills.[36]

have the unconditional right to intervene to defend the validity or scope of such claim. The party challenging the validity or scope of the claim shall serve upon the patent owner a copy of the earliest pleadings asserting such invalidity. If such owner cannot be served with such pleadings, after reasonable diligence is exercised, service may be made as provided for in the Federal Rules of Civil Procedure and, in addition, notice shall be transmitted to the Patent Office and shall be published in the Official Gazette."

[35] "Cancellation by court

"(a) In any action in a Federal court in which the issue of the validity of a claim of a patent is drawn into question, and the owner of the patent is shown by the records of the Patent Office is a party or has been given notice as provided in subsection (b) of this section, the court may, upon final adjudication, from which no appeal has been or can be taken, holding the claim to be invalid after such claim has previously been held invalid on the same ground by a court of competent jurisdiction from which no appeal has been or can be taken, order cancellation of such claim from the patent. Within thirty days of such order the clerk of the court shall transmit notice thereof to the Commissioner, who shall place the same in the public records of the Patent Office pertaining to such patent, and notice of cancellation of the claim shall be published by the Commissioner and endorsed on all copies of the patent thereafter distributed by the Patent Office.

"(b) In any action in a Federal court in which the validity of a claim of a patent is drawn into question, the owner of the patent, as shown by the records of the Patent Office, shall have the unconditional right to intervene to defend the validity of such claim. The party challenging the validity of the claim shall serve upon the patent owner a copy of the earliest pleadings asserting such invalidity. If such owner cannot be served with such pleadings, after reasonable diligence is exercised, service may be made as provided for in the Federal Rules of Civil Procedure and, in addition, notice shall be transmitted to the Patent Office and shall be published in the Official Gazette."

[36] See, e. g., Hearings on General Revision of the Patent Laws before Subcommittee No. 3 of the House Committee on the Judiciary, 90th Cong., 1st and 2d Sess. (1967–1968); 1967 Senate Hearings,

In the Senate hearings, a member of the President's Commission remarked:

> "The businessman can be subjected to considerable harassment as an alleged infringer. Even in cases where he feels strongly that the patent would ultimately be held invalid, when he considers the hundreds of thousands of dollars in complex cases that could be involved in defending a suit, he may conclude that the best course of action is to settle for less to get rid of the problem. These nuisance settlements, although distasteful, are often, under the present system, justified on pure economics.
>
> .        .        .        .        .
>
> "In many instances the very survival of the small businessman may be at stake. His cost of fully litigating a claim against him can seriously impair his ability to stay in business." 1967 Senate Hearings 103.[37]

The tendency of *Triplett* to multiply the opportunities for holders of invalid patents to exact licensing agreements or other settlements from alleged infringers must

_____

*supra,* n. 28.    In House Hearings, testimony on *in rem* invalidity provisions covered the full spectrum of opinion. The Patent Section of the American Bar Association was opposed. House Hearings 464–465. The Department of Justice favored it. *Id.,* at 622. The Judicial Conference of the United States approved the provision in principle. Report of the Proceedings of the Judicial Conference of the United States, Feb. and Sept. 1968, p. 81. Testimony in the Senate Hearings was also varied.

[37] Although these bills died in committee, it is noteworthy that by ascribing binding effect to the first federal declaration of invalidity, some of the proposed provisions went beyond mere abrogation of *Triplett's* mutuality principle. Had the statutes been enacted as proposed, see nn. 34–35, *supra,* the question of whether the patentee had a full and fair opportunity to litigate the validity of his patent in the first suit would apparently have been irrelevant once it was shown that the patentee had received notice that the validity of his patent was in issue.

be considered in the context of other decisions of this Court. Although recognizing the patent system's desirable stimulus to invention, we have also viewed the patent as a monopoly which, although sanctioned by law, has the economic consequences attending other monopolies.[38] A patent yielding returns for a device that fails to meet the congressionally imposed criteria of patentability is anomalous.[39] This Court has observed:

> "A patent by its very nature is affected with a public interest. . . . [It] is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope." *Precision Instrument Mfg. Co.* v. *Automotive Maintenance Machinery Co.,* 324 U. S. 806, 816 (1945).

One obvious manifestation of this principle has been the series of decisions in which the Court has condemned attempts to broaden the physical or temporal scope of the patent monopoly. As stated in *Mercoid* v. *Mid-Continent Investment Co.,* 320 U. S. 661, 666 (1944):

> "The necessities or convenience of the patentee do not justify any use of the monopoly of the patent

---

[38] See generally *Sears, Roebuck & Co.* v. *Stiffel Co.,* 376 U. S. 225, 229–230 (1964); *Compco Corp.* v. *Day-Brite Lighting,* 376 U. S. 234 (1964); Kennedy, Patent and Antitrust Policy: The Search for a Unitary Theory, 35 Geo. Wash. L. Rev. 512 (1967).

[39] *United States* v. *Bell Telephone Co.,* 128 U. S. 315, 357, 370 (1888); see also *Katzinger Co.* v. *Chicago Mfg. Co.,* 329 U. S. 394, 400–401 (1947); *Cuno Corp.* v. *Automatic Devices Corp.,* 314 U. S. 84, 92 (1941); *A. & P. Tea Co.* v. *Supermarket Corp.,* 340 U. S. 147, 154–155 (1950) (concurring opinion).

to create another monopoly. The fact that the patentee has the power to refuse a license does not enable him to enlarge the monopoly of the patent by the expedient of attaching conditions to its use. *United States* v. *Masonite Corp.,* [316 U. S. 265,] 277 [(1942)]. The method by which the monopoly is sought to be extended is immaterial. *United States* v. *Univis Lens Co.,* [316 U. S. 241,] 251–252 [(1942)]. The patent is a privilege. But it is a privilege which is conditioned by a public purpose. It results from invention and is limited to the invention which it defines." [40]

A second group of authorities encourage authoritative testing of patent validity. In 1952, the Court indicated that a manufacturer of a device need not await the filing of an infringement action in order to test the validity of a competitor's patent, but may institute his own suit under the Declaratory Judgment Act. *Kerotest Mfg. Co.* v. *C-O-Two Co.,* 342 U. S., at 185–186.[41] Other

---

[40] See also *Brulotte* v. *Thys Co.,* 379 U. S. 29 (1964); *International Salt Co.* v. *United States,* 332 U. S. 392 (1947); *United States* v. *Gypsum Co.,* 333 U. S. 364, 389 (1948); *Scott Paper Co.* v. *Marcalus Co.,* 326 U. S. 249 (1945); *Morton Salt Co.* v. *Suppiger Co.,* 314 U. S. 488, 491–492 (1942); *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 455–459 (1940); *International Business Machines Corp.* v. *United States,* 298 U. S. 131 (1936); *Carbice Corp.* v. *American Patents Corp.,* 283 U. S. 27 (1931); *Motion Picture Patents Co.* v. *Universal Film Co.,* 243 U. S. 502 (1917).

[41] In *Walker Process Equipment, Inc.* v. *Food Machinery & Chemical Corp.,* 382 U. S. 172 (1965), the defendant in an infringement action was permitted to counterclaim for treble damages under § 4 of the Clayton Act by asserting that the patent was invalid because procured or enforced with knowledge of fraud practiced on the Patent Office, "provided the other elements necessary to a [monopolization case under § 2 of the Sherman Act] are present." *Id.,* at 174.

decisions of this type involved removal of restrictions on those who would challenge the validity of patents.[42]

Two Terms ago in *Lear, Inc.* v. *Adkins,* 395 U. S. 653 (1969), we relied on both lines of authority to abrogate the doctrine that in a contract action for unpaid patent royalties the licensee of a patent is estopped from proving "that his licensor was demanding royalties for the use of an idea which was in reality a part of the public domain." 395 U. S., at 656. The principle that "federal law requires that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent," 395 U. S., at 668, found support in *Sears* and *Compco* and the first line of cases discussed above.[43] The holding that licensee estoppel was no longer tenable was rooted in the second line of cases eliminating obstacles to suit by those disposed to challenge the validity of a patent. 395 U. S., at 663–668. Moreover, as indicated earlier, we relied on practical considerations that patent licensees "may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery." 395 U. S., at 670.

To be sure, *Lear* obviates to some extent the concern that *Triplett* prompts alleged infringers to pay royalties on patents previously declared invalid rather than to engage in costly litigation when infringement suits are

---

[42] See *MacGregor* v. *Westinghouse Electric & Mfg. Co.,* 329 U. S. 402, 407 (1947); *Katzinger Co.* v. *Chicago Mfg. Co.,* 329 U. S., at 398–401; *Scott Paper Co.* v. *Marcalus Co., supra; Sola Electric Co.* v. *Jefferson Electric Co.,* 317 U. S. 173 (1942); *Westinghouse Electric & Mfg. Co.* v. *Formica Insulation Co.,* 266 U. S. 342 (1924); *Pope Mfg. Co.* v. *Gormully,* 144 U. S. 224, 234 (1892).

[43] See *Sears,* 376 U. S., at 229–231; see also *Beckman Instruments, Inc.* v. *Technical Development Corp.,* 433 F. 2d 55, 58–59 (CA7 1970); *Kraly* v. *National Distillers & Chemical Corp.,* 319 F. Supp. 1349 (ND Ill. 1970).

threatened. *Lear* permits an accused infringer to accept a license, pay royalties for a time, and cease paying when financially able to litigate validity, secure in the knowledge that invalidity may be urged when the patentee-licensor sues for unpaid royalties. Nevertheless, if the claims are in fact invalid and are identical to those invalidated in a previous suit against another party, any royalties actually paid are an unjust increment to the alleged infringer's costs. Those payments put him at a competitive disadvantage *vis-à-vis* other alleged infringers who can afford to litigate or have successfully litigated the patent's validity.

This has several economic consequences. First, the alleged infringer who cannot afford to defend may absorb the royalty costs in order to compete with other manufacturers who have secured holdings that the patent is invalid, cutting the profitability of his business and perhaps assuring that he will never be in a financial position to challenge the patent in court. On the other hand, the manufacturer who has secured a judicial holding that the patent is invalid may be able to increase his market share substantially, and he may do so without coming close to the price levels that would prevail in a competitive market. Because he is free of royalty payments, the manufacturer with a judgment against the patent may price his products higher than competitive levels absent the invalid patent, yet just below the levels set by those manufacturers who must pay royalties. Third, consumers will pay higher prices for goods covered by the invalid patent than would be true had the initial ruling of invalidity had at least the potential for broader effect. And even if the alleged infringer can escape royalty obligations under *Lear* when he is able to bear the cost of litigation, any royalty payments passed on to consumers are as a practical matter unrecoverable by those who in fact paid them. Beyond all of this, the

rule of *Triplett* may permit invalid patents to serve almost as effectively as would valid patents as barriers to the entry of new firms—particularly small firms.

Economic consequences like these, to the extent that they can be avoided, weigh in favor of modification of the *Triplett* mutuality principle. Arguably, however, the availability of estoppel to one charged with infringement of a patent previously held invalid will merely shift the focus of litigation from the merits of the dispute to the question whether the party to be estopped had a full and fair opportunity to litigate his claim in the first action. Moore & Currier, *supra,* n. 7, at 309–310. It would seem sufficient answer to note that once it is determined that the issue in both actions was identical, it will be easier to decide whether there was a full opportunity to determine that issue in the first action than it would be to relitigate completely the question of validity. And, this does not in fact seem to have been a problem in other contexts, where strict mutuality of estoppel has been abandoned.

It has also been suggested that 35 U. S. C. § 285, which allows a court to award reasonable attorney's fees to a prevailing party "in exceptional cases,"[44] and 35 U. S. C. § 288, under which a patentee forfeits his right to recover costs even as to the valid claims of his patent if he does not disclaim invalid claims before bringing suit, work to inhibit repetitious suits on invalid patents. But neither of these provisions can operate until after litigation has occurred, and the outlay required to try a lawsuit presenting validity issues is the factor which undoubtedly forces many alleged infringers into ac-

---

[44] Including, apparently, a suit on a patent previously held invalid and as to which the second court can find no reasonable argument for validity. See *Tidewater Patent Development Co.* v. *Kitchen,* 371 F. 2d 1004, 1013 (CA4 1966); *Dole Valve Co.* v. *Perfection Bar Equipment, Inc.,* 318 F. Supp. 122 (ND Ill. 1970).

cepting licenses rather than litigating. If concern about such license agreements is proper, as our cases indicate that it is, the accused infringer should have available an estoppel defense that can be pleaded affirmatively and determined on a pretrial motion for judgment on the pleadings or summary judgment. Fed. Rules Civ. Proc. 8 (c), 12 (c), and 56.

## C

As the preceding discussion indicates, although patent trials are only a small portion of the total amount of litigation in the federal courts, they tend to be of disproportionate length.[45] Despite this, respondents urge that the burden on the federal courts from relitigation of patents once held invalid is *de minimis*. They rely on the figures presented in the 1961 Staff Report: during the period 1948–1959, 62 federal suits were terminated which involved relitigation of a patent previously held invalid, a figure constituting about 1% of the patent suits commenced during the same period. The same figures show that these 62 suits involved 27 patents, indicating that some patentees sue more than once after their patent has been invalidated. Respondents also urge that most of these 62 suits were settled without litigation. 1961 Staff Report 19. But, as we have suggested, this fact cuts both ways.

Even accepting respondents' characterization of these figures as *de minimis*, it is clear that abrogation of *Triplett* will save *some* judicial time if even a few relatively lengthy patent suits may be fairly disposed of on pleas of estoppel. More fundamentally, while the cases do discuss reduction in dockets as an effect of elimination of the mutuality requirement, they do not purport to hold that predictions about the actual amount of judicial time that will be saved under such a holding control de-

---

[45] See nn. 31–33, *supra,* and accompanying text.

cision of that question. Of course, we have no comparable figures for the past decade concerning suits begun after one declaration of invalidity, although a number of recent, significant examples of repeated litigation of the same patent have come to our attention.[46] Regardless of the magnitude of the figures, the economic consequences of continued adherence to *Triplett* are serious and any reduction of litigation in this context is by comparison an incidental matter in considering whether to abrogate the mutuality requirement.

## D

It is clear that judicial decisions have tended to depart from the rigid requirements of mutuality. In accordance with this trend, there has been a corresponding development of the lower courts' ability and facility in dealing with questions of when it is appropriate and fair to impose an estoppel against a party who has already litigated an issue once and lost. As one commentator has stated:

> "Under the tests of time and subsequent developments, the *Bernhard* decision has proved its merit and the mettle of its author. The abrasive action of new factual configurations and of actual human controversies, disposed of in the common-law tradition by competent courts, far more than the commentaries of academicians, leaves the decision revealed for what it is, as it was written: a shining landmark of progress in justice and law administration." Currie, 53 Calif. L. Rev., at 37.

When these judicial developments are considered in the light of our consistent view—last presented in *Lear, Inc.* v. *Adkins*—that the holder of a patent should not be insulated from the assertion of defenses and thus allowed

---

[46] See, *e. g.*, cases cited n. 5, *supra;* Brief for Petitioner B–T 13–14; Brief for the United States as *amicus curiae* 28 and 32 n. 12.

to exact royalties for the use of an idea that is not in fact patentable or that is beyond the scope of the patent monopoly granted, it is apparent that the uncritical acceptance of the principle of mutuality of estoppel expressed in *Triplett* v. *Lowell* is today out of place. Thus, we conclude that *Triplett* should be overruled to the extent it forecloses a plea of estoppel by one facing a charge of infringement of a patent that has once been declared invalid.

## IV

*Res judicata* and collateral estoppel are affirmative defenses that must be pleaded. Fed. Rule Civ. Proc. 8 (c). The purpose of such pleading is to give the opposing party notice of the plea of estoppel and a chance to argue, if he can, why the imposition of an estoppel would be inappropriate. Because of *Triplett* v. *Lowell,* petitioner did not plead estoppel and respondents never had an opportunity to challenge the appropriateness of such a plea on the grounds set forth in Part III–A of this opinion. Therefore, given the partial overruling of *Triplett,* we remand the case. Petitioner should be allowed to amend its pleadings in the District Court to assert a plea of estoppel. Respondents must then be permitted to amend their pleadings, and to supplement the record with any evidence showing why an estoppel should not be imposed in this case. If necessary, petitioner may also supplement the record. In taking this action, we intimate no views on the other issues presented in this case. The judgment of the Court of Appeals is vacated and the cause is remanded to the District Court for further proceedings consistent with this opinion.