Dorothy Kane RAWLS, Plaintiff-Appellant,

v.

DAUGHTERS OF CHARITY OF SAINT VINCENT De PAUL, INC., the Administrators of Saint Vincent de Paul Hospital; Insurance Company of North America; Harold Bolding; the Aetna Casualty & Surety Company; Charles B. Odom, Individually and as Coroner of Jefferson Parish and The Surety of his Bond, St. Paul Fire and Marine Insurance Company; and Genevieve Arneson, Defendants-Appellees.

No. 71–2519.

United States Court of Appeals, Fifth Circuit.

March 15, 1974.
Rehearing and Rehearing En Banc Denied May 14, 1974.

**142**

Henry L. Klein, New Orleans, La., for plaintiff-appellant.

H. Martin Hunley, Jr., New Orleans, La., for Daugh. of Charity, Ins. Co. of N. America & De Paul Hospital.

Henry B. Alsobrook, Jr., New Orleans, La., for Dr. H. Bolding & Aetna.

Lawrence D. Wiedemann, New Orleans, La., for Dr. Charles Odom.

John M. Mamoulides, Dist. Atty., Metairie, La., for Odom & Arneson.

Before TUTTLE, GODBOLD and MORGAN, Circuit Judges.

TUTTLE, Circuit Judge:

On March 24, 1969, appellant Rawls instigated this suit against (1) De Paul Hospital, (2) Dr. Bolding, a psychiatrist, and their respective insurers, contending that they falsely imprisoned her while a patient at De Paul Hospital from January 9, 1969 to March 4, 1969. Appellant Rawls also sued (3) Dr. Odom, the Coroner, (4) Dr. Arneson, his assistant, and their respective insurers, claiming they not only falsely imprisoned her, but also acting under color of state law deprived her of her civil rights.

The district court denied Rawls' motion for summary judgment against De Paul Hospital. Appellant Rawls did not make a motion for directed verdict against any of the parties. After a seven day trial, the jury returned a verdict for all defendants and the district court refused to grant appellant Rawls' motion for a judgment notwithstanding the verdict. The assignment of errors by the appellant are the district court's: (1) denial of the post-trial motion of judgment notwithstanding the verdict; (2) failure to grant summary judgment against De Paul Hospital; (3) exclusion of testimony of Dr. Szasz; (4) failure to instruct jury charges #3–12 submitted by appellant; and (5) inclusion of jury instruction that the January 22 court order was valid on its face and was a defense interposed by all defendants.

## I. LOUISIANA MENTAL HEALTH LAW

The touchstone for initially analyzing this controversy is the Louisiana Mental Health Law, LSA–R.S. §§ 28:1 et seq., in particular the provisions regarding procedures for commitment to a mental institution and rights of patients therein. At the time of the commitment in this case, the Louisiana Mental Health Law provided four methods for the purely civil commitment of the mentally ill: voluntary admission, coroner's commitment, judicial commitment and emergency commitment. The following three are involved in this case:

### § 51. *Voluntary admission*

"Any mentally ill, inebriate, or epileptic person who desires to submit himself for treatment *may apply to the superintendent for admission* to the appropriate institution named in Part II of this Chapter, or to *any private mental hospital* or institution, *provided he is first fully informed of the provisions* of this Chapter, *fully understands them,* and *agrees, to obey the rules of the institution.*

"A. The superintendent of any state mental institution may so receive and detain the applicant, *provided he believes him mentally competent to make the application* and to be in need of care. Should the patient become incompetent or otherwise unable to demand his discharge, the superintendent shall request commitment by the court in whose district the hospital or institution is located. . . ." (Emphasis supplied).

### § 52. *Coroner's commitment*

"Any near relative, or in the absence of relatives, a near friend, curator, or other responsible person shall apply to the coroner to have a patient committed to an institution.

"The application shall be in writing on the form prescribed by the department and shall give the name, sex, and residence of the patient, the reason why institutional care is needed, and any other information the department deems necessary. It shall be accompanied by a certificate of the coroner and one other qualified physician, stating that *they have examined the patient within three days of the application and that he is in need of observation or care in an institution. The certificate shall state the facts and sources of information and personal observations upon which opinion is based. . . . After complying with the above provisions the application for commitment shall be presented to the judge of the judicial district court or the civil district court for the parish from which the patient is to be committed, for his approval or disapproval.* The application for commitment can be acted upon by the judge in open court or in chambers, in term time or in vacation, without the necessity of formally docketing and allotting said application.

"The superintendent may admit the patient to the institution within fourteen days of the examination by the coroner and the physician.

"After fourteen days the certificate of examination of the coroner and the physician is invalid. . . ." (Emphasis supplied).

### § 53. *Judicial commitment*

"A. Upon application by any responsible person, accompanied by a certificate as provided in R.S. 28:52, the judge of the civil district court may commit to an institution any patient within his jurisdiction when, in his opinion, commitment is in the best in-

terest of the patient and the community. *The court shall fix a date for a hearing to be held not less than five days* from receipt of examiner's report. . . ." (Emphasis supplied).[1]

Two additional provisions of the Louisiana Mental Health Law bear upon the plaintiff's rights in this case:

### § 98.1. *Right to release on application of voluntary patients*

"A voluntary patient who requests his release or whose release is requested, in writing, by his legal tutor, parent, spouse, or adult next of kin shall be released forthwith . . ."

### § 171. *Enumeration of rights guaranteed*

"Every mental patient is guaranteed the following rights: (1) To communicate in private with counsel or with the director or an agent of the department. . . ."[2]

Familiarity with these prerequisites for, and rights appurtenant to, commitment to a mental institution in Louisiana enables us to understand the significance of certain events in the course of the plaintiff's confinement.

## II. FACTS

The following is a chronological outline of events giving rise to this lawsuit.

*January 9, 1969*

Mr. Rawls, plaintiff's husband and Mr. Kane, plaintiff's brother, initiated an application for the commitment of Dorothy K. Rawls in the Coroner's Office. Mr. Bergeron of the Coroner's Office began filling in a form entitled "In Re Application for Commitment." He explained that as a prerequisite to commitment under Louisiana law, i. e. Coroner's Commitment Section 28:52, either

1. Sections 52 and 53 are stated as they existed at the time of the conduct in controversy. The 1972 amendments to these sections specified with greater detail the procedures to be followed in committing patients and incorporated grants of immunity to certain persons assisting in the commitment procedure.

2. Section 98 was repealed in its entirety in 1972, after the conduct giving rise to this lawsuit occurred. Section 171 was amended in 1972, but still contained a provision stating: "Every patient shall have the right. . . . (7) To be visited in private by his attorney at all times. . . ."

(1) Mrs. Rawls must be examined by a doctor who then recommends the commitment, or, (2) the only other procedure was to issue a warrant which would authorize the police to arrest Mrs. Rawls for examination. Mr. Rawls stated his wife would not go to a doctor; Mr. Rawls and Mr. Kane objected to the warrant procedure. Mr. Bergeron testified he wrote "Warrant issued for her to be picked up and held for examination" on the commitment application at this point, because Mr. Rawls said he was going to apply for a warrant in the future. Mr. Bergeron's testimony was that he only wrote this statement there for his information, considered the application withdrawn and placed it in his desk drawer. A warrant was never issued for Mrs. Rawls, but the language, "Warrant issued for her to be picked up and held for examination," remained on the partially completed commitment application.

Later that morning, Mr. Kane telephoned Dr. Bolding, a private psychiatrist, authorized to admit patients to De Paul Hospital. Dr. Bolding arranged to have plaintiff admitted and notified the hospital to expect Mrs. Rawls.

Mr. Rawls called an ambulance from a private concern which came to Mrs. Rawls' home around 2:45 p. m. A second ambulance from the Coroner's Office arrived at the scene because it was aiding the private ambulance in locating the address. When the private ambulance arrived, neighbors stated the lady inside will probably give you trouble. So the private ambulance attendants called the police for assistance and a patrol car with two officers came immediately. Mr. and Mrs. Rawls were arguing at her home. Ambulance attendant Brewer testified that Mrs. Rawls requested an attorney and that at first she did not want to go. Her husband tried to persuade her, but she still refused. Police officer Danos discovered that the ambulance attendants did not have any commitment papers or a warrant, and he told Mrs. Rawls that she was not obliged to leave with the ambulance attendants.

The plaintiff stated, according to Danos, that she would accompany the ambulance attendants to De Paul to prove to her husband that she was not mentally ill. She eventually went without resisting physically. Attendant Macera testified that Mrs. Rawls spoke of obtaining an attorney all the way to the hospital.

Upon arrival at the hospital, *Mr. Rawls* signed the "Admission Agreement," the "Statement of Financial Responsibility," and the "Application for Commitment." Since the Coroner's application was not completed at this juncture and since a judicial commitment had not been instigated yet, this initial admission must be sustained as a voluntary admission under section 28:51 in order to be lawful. Mrs. Rawls did not sign any documents upon entering the hospital and was not apprised of her rights, as required in section 28:51. Dr. Head, the medical director, admitted his inability to locate any admission papers signed by Mrs. Rawls. There was no contrary evidence on these two points. Nevertheless, the hospital accepted the husband's application and admitted Mrs. Rawls.

Prior to plaintiff's admission, Dr. Bolding had issued written orders on the hospital chart to the nursing personnel that she was not to be allowed to make telephone calls. However, Mrs. Rawls was not prohibited from corresponding by mail throughout her confinement at De Paul Hospital. After arriving at the hospital Mrs. Rawls repeatedly requested permission to call her lawyer, which was denied. Her protests were noted on the hospital chart, as follows:

"No phone calls." (Jan. 9)

"Patient has been VERY angry all p. m. over 'fact of being committed'— continuously asking to use phone to get in contact with lawyers, etc., to get a lawsuit against her husband 'before he leaves the country with my sons,' states she thought the State appointed the doctor—did not ask for Dr. Bolding, etc." (1/9/69)

"Evening supervisor spoke with pt. re: not using the phone as ordered by Dr. Bolding (who was notified of the situation and stated absolutely NO PHONE CALLS)" (Jan. 9)

"Pt. has appeared hostile throughout the day toward hospitalization—her doctor—husband. Said she was snatched up in the middle of the day from her home . . ." (January 10)

". . . Harps on injustice of her being locked up like this for no reason." (1/10/69).

"Was of the feeling that she needed not to be here." (1/13/69).

"Still insists she does not belong here . . ." (1/14/69).

"Still very angry about being locked up here." (1/15/69).

"Remarks to the patients that she was 'supposed to be crazy'—seems to think that locking anyone up in De Paul makes them sick—even if they are not when they arrive." (1/20/69).

"Expressed to the group her feeling that she was railroaded into this place." (1/21/69).

"The nurse's line supervisor received a phone call from a former female patient who left here Saturday, saying patient was being held here against her will." (1/27/69).

"Request to call her lawyer. Dr. Bolding telephoned. Dr. Bolding returned call. Patient told of Doctor's call. Appeared angered, saying she'd get a lawyer somehow." (1/27/69).

"Dr. Head telephoned about hospital policy toward committing pts. and their legal rights." (1/30/69).

"Pt. allowed to call her lawyer, as hospital policy is that pt. can at any time they want." (1/30).

Mrs Rawls testified that she specifically requested to use the telephone on numerous occasions, and that she was told if she did not refrain from asking, she would be placed in tighter security and strapped down. On the other hand, the nurses indicated that they understood Mrs. Rawls was requesting to call a lawyer not for the protection of her own rights, but only to sue her husband. The nurses' testimony was that Mrs. Rawls never stated that she was being held against her will and never specifically demanded release from the hospital.

### January 20, 1969

The Coroner's Office received a call from a male, either Mr. Rawls or Mr. Kane, and Mr. Bergeron reactivated the prior partially completed application for commitment of Mrs. Rawls. First, Mr. Bergeron called De Paul to affirm that Mrs. Rawls was still a patient, and then sent Dr. Arneson to examine Mrs. Rawls on January 21, 1969. Drs. Bolding and Arneson signed the commitment application certifying that Mrs. Rawls was suffering from "Acute Paranoid Reaction," as two doctors' signatures were necessary for commitment. Next to their signature, they wrote the date "1/21/69." The Coroner's Office sent this commitment application on the 20th of January, but the date January 9, 1969, remained on it. One line of the application stated: "Date of application *1/9/69*, Date Examined *1–21–69*." Furthermore, a few lines above this provision the commitment application was prefaced, as follows:

"NOTE: L.S.A.R.S. 28:52 of the Legislature of Louisiana specifies that this patient must be examined within (3) three days of date of application and must be admitted to the hospital not longer than (14) fourteen days from the date of examination of the patient by the coroner and physician."

Therefore, the commitment application date was January 9, 1969, and the medical examination by Dr. Arneson was on January 21, 1969, which was not within the three day mandate from date of application, as required by section 28:52.

### January 22, 1969

A Louisiana judge issued an *ex parte* commitment order based on the aforesaid commitment application. This judi-

cial commitment proceeding was held without the minimum five day notice between date of examination and final hearing and the hearing itself as commanded in section 28:53.

### January 30, 1969

Mrs. Rawls continued her demands for access to a telephone and an attorney. Dr. Bolding explained that until January 30, 1969, he interpreted Mrs. Rawls' requests to call an attorney as being only for the purpose of suing her husband and not to gain her own release. He denied the telephone privilege because he did not think it was therapeutic. Finally, a nurse called Dr. Head, the medical director of the hospital, who gave orders that Mrs. Rawls be permitted to call an attorney immediately, since it was a hospital policy that patients be allowed to call an attorney. Mrs. Rawls telephoned a legal aid attorney, Mr. Gibson, made an appointment, and was given permission to leave, accompanied by a hospital attendant, to see him. Mr. Gibson told Mrs. Rawls that she was not obliged to return to the hospital, but could leave his office and go where she wished. Mrs. Rawls felt that nevertheless De Paul would find and detain her again, so she returned to the hospital.

### March 4, 1969

Later Mrs. Rawls engaged her present attorney who filed a habeas corpus proceeding on March 4, 1969. At the habeas corpus hearing De Paul Hospital made no opposition, but simply brought the patient into court and produced the order of commitment rendered on January 22, 1969. The court ruled that the January 22 court order was illegal, on its face. The judge stated:

"The fundamental reason for discharging this patient is however, the legal reason, namely, failure to give the five day minimum notice between the date of examination and final hearing."

dc

The court ordered Mrs. Rawls released from De Paul Hospital.

### Summary

In short, the De Paul Hospital contends it held Mrs. Rawls (1) from January 9, 1969 to January 22, 1969, as a voluntary patient as defined in section 28:51, and (2) from January 22, 1969 to March 4, 1969, as an involuntary patient under the authority of an ostensibly valid court order of commitment procured under either the Coroner's or Judicial Commitment provisions, sections 28:52 and 28:53.[3] Contrariwise, Mrs. Rawls asserts that she only submitted to the apparent authority of the ambulance drivers, and police officers, entered the hospital involuntarily and remained at the hospital against her will thereafter.

## III. MOTION FOR J.N.O.V.

### A. False Imprisonment Claims

■ We first consider the plaintiff's cause of action for false imprisonment against all the defendants. The Louisiana decisions clearly dealing with false imprisonment claims have held that for false imprisonment to take place there must be a total and unlawful restraint of a person's freedom of locomotion. Crossett v. Campbell, 122 La. 659, 48 So. 141 (1909); Sweeten v. Friedman, 9 La.App. 44, 118 So. 787 (1928). Thus, the two essentials of a false imprisonment cause of action are (1) the detention or total restraint of the person, and (2) the unlawfulness of such detention. In order to determine if there was a detention or total restraint, consideration is necessary whether the confinement in the case was voluntary or involuntary.

---

3. It was never completely clear whether the court order was committing the plaintiff under section 28:52, Coroner's Commitment, or section 28.53, Judicial Commitment. Under both sections the commitment application must be submitted for approval to a judge. The plaintiff argued at the habeas corpus hearing that section 28:53 was the relevant provision. The state judge agreed and granted plaintiff's writ because she had not been accorded a hearing within five days of the committing judge's receipt of the coroner's report.

Possibly, the undisputed evidence may have overwhelmingly supported the unlawfulness and involuntariness of her original confinement so that she might have been entitled to a motion for judgment notwithstanding the verdict on these elements. However, the impediment to granting this relief is that the record contains no indication that the plaintiff filed a motion for a directed verdict at the close of the evidence. Moreover, none of the plaintiff's requests for instructions to the jury fairly can be read as amounting to a request for a directed verdict. Therefore, this Court cannot consider plaintiff's contention that the district court erred in refusing to enter a judgment notwithstanding the verdict because a motion for a directed verdict is a prerequisite for relief on a motion for a j. n. o. v. under Fed.R.Civ.P. 50(b). Holmes v. Wack, 464 F.2d 86, 89–90 (10th Cir. 1972); Hernandez v. Employer's Mutual Liability Insur. Co., 346 F.2d 154, 155 (5th Cir. 1965); Indamer Corp. v. Crandon, 217 F.2d 391, 393 (5th Cir. 1954).

Consequently, no issue regarding the sufficiency of the evidence to support the jury verdict is properly before us, since federal appellate courts do not directly review jury verdicts. The obvious reason for this principle is that a reviewing court will not consider for the first time a party's contention that the verdict is not supported by the evidence. The issue must be first submitted to the trial court. *See* Holmes v. Wack, *supra* 464 F.2d at 90. The failure to move for a direct verdict thus precludes our consideration whether the district court properly denied the judgment notwithstanding the verdict on the false imprisonment claim against all defendants.

### B. *Deprivation of Constitutional Rights*

The plaintiff also alleged that Dr. Odom, the Coroner, and Dr. Arneson, his assistant, acting under color of state law violated her constitutional rights, thus affording her a cause of action under section 1983. The factual inquiries concerning whether these two public officials complied with the state commitment law and whether plaintiff was deprived of her liberty, that is whether she was being held voluntarily or involuntarily, were submitted to the jury. Again, although the evidence may have overwhelmingly supported the involuntariness of certain stages of her confinement and the noncompliance with the state law by the public officials, the insurmountable obstacle is again that the plaintiff made no motion for directed verdict on these issues. Since a motion for a directed verdict is a prerequisite for relief on a motion for j. n. o. v. under Fed.R.Civ.P. 50(b), this Court cannot review the sufficiency of the evidence to support the jury verdict on this claim.

### IV. SUMMARY JUDGMENT MOTION AGAINST DE PAUL HOSPITAL

On October 8, 1969, pursuant to Fed. R.Civ.P. 56(c), the plaintiff made a motion for a summary judgment against one defendant, De Paul Hospital, which presents the possibility of partial review of the evidence on the false imprisonment claim. In order to grant a summary judgment, a court must be satisfied not only that there is no issue as to any material fact, but also that the moving party is entitled to a judgment as a matter of law. The court's function is to determine whether a genuine issue of material fact exists and not to resolve any existing factual issues. Applied to this defendant, the issue on the motion for summary judgment was whether as a matter of law the plaintiff was falsely imprisoned from January 9, 1969 to March 4, 1969 by De Paul Hospital.

In support of her motion for summary judgment against De Paul Hospital, the plaintiff submitted the following: (1) affidavits of the plaintiff and Mr. and Mrs. Kane; (2) copies of the habeas corpus writ and of the transcript of the habeas corpus hearing; (3) her entire hospital record; (4) answers to interrogatories by the hospital; (5) a copy

of the court proceedings committing the plaintiff, which included the order committing her and the supporting application for commitment proffered by the Coroner's Office. In opposition, the defendants introduced the following: (1) depositions of the plaintiff, Mrs. Kane and Dr. Arneson; (2) affidavits from nurses at De Paul, Dr. Head, the medical director, and Sister Taylor, the administrator.

■ The primary argument made by the appellant at the summary judgment stage was that under the principles of res judicata and collateral estoppel the confinement during the entire period was illegal as a matter of law because at the habeas corpus hearing the judge held the confinement illegal. True, the habeas hearing did decide that the January 22, 1969, court order was improvidently granted. However, the commitment order being illegal does not establish as a matter of law that the hospital falsely imprisoned the plaintiff. The appellant's strenuous assertion at trial and on appeal that the ruling on the habeas corpus petition precludes relitigation of the unlawfulness of the confinement is without merit. Plaintiff proposes a so-called "offensive use" of preclusion-by-judgment principles, which is generally frowned upon by the courts. Moreover, the criteria set forth in the leading Supreme Court opinion in the area, Blonder-Tongue Laboratories v. Univ. of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), are not satisfied. For example, at the habeas corpus hearing De Paul Hospital had far less incentive to contest the unlawfulness of the plaintiff's detention than at present.

■ In the alternative to the res judicata plea, the plaintiff urged that the confinement was illegal as a matter of law due to the noncompliance with the statutory mandates of section 28:52, Coroner's Commitment, and section 28:- 53, Judicial Commitment. The plaintiff's summary judgment argument was that the coroner had used a stale application, in violation of the three day maximum between date of application and date of examination as required in section 28:52 and that the court had failed to grant the plaintiff a hearing as commanded in section 28:53. In order to establish false imprisonment as a matter of law, the plaintiff had to show that there was no material issue of fact presented not only as to the unlawfulness but also as to the involuntariness of her confinement. It is helpful to break down the analysis of the evidence at the summary judgment stage in terms of two distinct periods of confinement: (1) the initial admission to January 22, 1969; and (2) January 22, 1969, to March 4, 1969.

Initial Admission to January 22, 1969: The initial entry into the hospital could have been justified only under section 28:51 as a voluntary admission, since the procedures for either Coroner's or Judicial commitment had not been completed at this stage. Although possibly, if not probably, the plaintiff could have shown as a matter of law that her initial admission did not comply with the requirements of section 28:51, since she did not sign the admission papers and was not informed of her rights, nonetheless, the plaintiff failed to argue in the motion for summary judgment that the confinement was illegal because the prerequisites under section 28:51 had not been met. Instead, the plaintiff only asserted that section 28:52 and section 28:53 had not been satisfied. Thus, the unlawfulness of her confinement during this period was not established as a matter of law at this stage in the proceedings.

In addition, the question of law regarding the voluntariness of the plaintiff's initial entry depended substantially upon an inquiry into the surrounding facts and circumstances. Although numerous affidavits, depositions, court orders and hospital records were submitted at the summary judgment stage, the district court could have refused to grant the motion for summary judgment against De Paul until the facts and circumstances were more sufficiently devel-

oped. For example, the testimony of the ambulance drivers and the police officers was necessary to establish the entire picture regarding the voluntariness of Mrs. Rawls' entry in the hospital. Although after this entire evidence was introduced at trial the court could have found it overwhelmingly established the involuntariness of Mrs. Rawls' confinement from January 9, 1969 to January 22, 1969, at the summary judgment stage the court correctly determined that there was a material issue of fact regarding the voluntariness of the initial entry, precluding a grant of summary judgment.

January 22, 1969 to March 4, 1969: The injection of the January 22, 1969 court order raised the material issue of fact whether the hospital validly relied on this court order. Plaintiff asserted that the order was invalid on its face, making the hospital liable as a matter of law. However, the asserted facial defect, the twelve day time lapse between the date of application and the date of examination of the plaintiff, was not in the order itself, but in the papers accompanying. A material issue of fact regarding whether the hospital correctly relied on the order was created, precluding a grant of summary judgment at this stage.

In addition, the injection of the visit to the legal aid attorney on January 30, 1969, further casts doubt upon whether the plaintiff established as a matter of law the involuntariness of her confinement during this later period. The legal aid attorney told her that she need not return to the hospital, but she did anyway feeling that the hospital would locate her and detain her again. This fact, accompanied by the discontinuance of notations in the hospital charts regarding plaintiff's admonitions to the nurses that she was being "railroaded" supported the voluntariness of her confinement, thus reducing the overwhelmingness of the evidence on involuntariness shown during the earlier part of her confinement, and raising a material issue of fact for the jury.

Therefore, neither the unlawfulness nor the involuntariness elements of her false imprisonment claims regarding the post January 22, 1969, confinement were established as a matter of law at the summary judgment stage.

## V. OTHER ALLEGED ERRORS

We have carefully considered the claim of appellant that the district court unduly restricted the expert testimony of Dr. Szasz, and conclude that no prejudicial error occurred in such limitations as were placed on the witness's otherwise extensive testimony.

So, too, we conclude that, after examining the charges tendered by the plaintiff and the fifty pages of jury instructions given, the charges proffered by the plaintiff but not given were either an incorrect statement of the law, or were already covered by another charge, or, in any event, their omission did not constitute prejudicial error.

There was no error in the court's instruction respecting the state court's order of commitment.

The judgment is affirmed.