**In the Matter of William MAGNAFICI, Debtor,**

**ST. PAUL FIRE & MARINE INSURANCE COMPANY, A Corporation, as Subrogee of First National Bank in Peru, Plaintiff,**

v.

**William MAGNAFICI, Defendant.**

**Bankruptcy Nos. 80 B 6777, 80 A 1176.**

United States Bankruptcy Court, N. D. Illinois, E. D.

Dec. 18, 1981.

Louis E. Olivero, Peru, Ill., for debtor.

Randall I. Marmor and Stephen M. Hallenbeck, Gilmartin, Hallenbeck & Schroeder, Chicago, Ill., for plaintiff.

OPINION AND ORDER

RICHARD L. MERRICK, Bankruptcy Judge.

This cause came on to be heard upon a motion for Summary Judgment of St. Paul Fire & Marine Insurance Company (hereinafter "St. Paul"), as subrogee of First National Bank in Peru, Illinois (hereinafter "the Bank"). The essential facts are not controverted, but the defendant, William Magnafici (hereinafter "Magnafici") contends that certain of them are not admissible for consideration upon a Motion for Summary Judgment. The admitted facts are that from 1968 through January, 1973, Magnafici was a Vice President and Senior Loan Officer of the Bank, a national banking institution, and that he filed a voluntary petition in bankruptcy on June 3, 1980.

The contention of St. Paul is that while Magnafici was a loan officer he embezzled $70,000 from the Bank for which he was convicted and sentenced[1] and for which St. Paul was obligated to reimburse the Bank under a fidelity insurance policy. Rather than to go to the expense and effort of proving the embezzlement in this proceeding, St. Paul relies on the doctrine of collateral estoppel to establish the fact of embezzlement by introducing a certified copy of the judgment of conviction of Magnafici and a copy of the indictment which was incorporated into the judgment by reference.

The legal theory of St. Paul is that the debt is non-dischargeable under § 523(a)(4) of the Bankruptcy Code,[2] which provides in pertinent part:

"§ 523. *Exceptions to Discharge*

(a) A discharge ... does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;"

The indictment consisted of three counts:

1. Count One essentially was a conspiracy count, and Magnafici was convicted of conspiracy;

2. Count Two essentially was a count directed toward the use and possession of false documents to defraud the United States, a violation of §§ 1001 and 1002 of the United States Criminal Code.[3] The conviction was for making false and fictitious statements to the Small Business Administration in violation of §§ 101 and 102 [sic] of the criminal code—§§ 101 and 102 are non-existent sections.

3. Count Three was an embezzlement count, and Magnafici was found guilty of embezzlement under § 656 of the Criminal Code.[4]

The debtor contends that the copy of the indictment and of the judgment are hearsay documents of which the Court may not take cognizance. If that theory is correct as matter of pleading, the Motion for Summary Judgment must fail because the only admitted facts would be that Magnafici had worked for a designated national bank and that he had filed a voluntary petition in bankruptcy. There would be no admitted obligation of a loan, nor of the nature of the loan, nor of the fact of a conviction, nor of the grounds of the conviction. There would not be any allegation of an embezzlement nor of the nature and amount of the embezzlement.

A quick look at the Federal Rules of Evidence, however, establishes that a properly authenticated judgment of previous conviction is admissible under Rule 803(22) as an exception to the hearsay rule. Thus we may rely upon the judgment of conviction and of the indictment incorporated into it to flesh out the skeleton of admitted facts.

A certified copy of the judgment of conviction and a copy of the indictment are

---

1. *United States of America v. William E. Magnafici*, 76 CR 415, N.D.Ill.1977.

2. Title 11, United States Code, § 523(a)(4).

3. Title 18, United States Code, §§ 1001 and 1002.

4. Title 18, United States Code, § 656.

attached as exhibits to an affidavit of John A. Zajicek, a claims supervisor of St. Paul. The principal purpose of Zajicek's affidavit is to establish that under its fidelity policy St. Paul was obligated to pay, and did pay, $70,000 to the Bank because of a specified transaction in which Magnafici had arranged a loan to a business which he owned (the McNabb Food Center loan). The position of St. Paul is that by payment under the fidelity policy the bank has been made whole with respect to the McNabb loan and that St. Paul has become the real party in interest and is subrogated to any rights which the Bank might have had.

The attorney for Magnafici contends that the affidavit of Zajicek is not admissible on the ground that it is a hearsay document. The same factual allegations that are made in the affidavit also were made in the amended complaint and were not addressed by any subsequent pleading of the defendant. Rule 708 of the Bankruptcy Rules provides in part:

"Rule 8 of the Federal Rules of Civil Procedure, except clause (a) of the subdivision (a) thereof, applies in adversary proceedings." [The excepted portion is a statement of the grounds of federal jurisdiction].

Rule 8 of the Federal Rules provides in part as follows:

"(d) *Effect of Failure to Deny*

Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading."

An answer is a required pleading; Rule 7(a), which was adopted by Bankruptcy Rule 707(a) provides in part:

"(a) *Pleadings.* There shall be a complaint and an answer;"

Rule 717 of the Bankruptcy Rules provides:

"Except as provided in Rules 212(f) and 512(d) [both of which apply to actions on bonds and are not germane to the present discussion] Rule 17 of the Federal Rules of Civil Procedure applies in adversary proceedings."

Rule 17 of the Federal Rules provides in part:

"(a) *Real Party in Interest.*

Every action shall be prosecuted in the name of the real party in interest."

Finally we turn to Bankruptcy Rule 756, which provides,

"Rule 56 of the Federal Rules of Civil Procedure applies in adversary proceedings."

Rule 56 provides in pertinent part:

"(e) . . . When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

Summarizing briefly the applicable Bankruptcy Rules, we find that a failure to answer the allegations of St. Paul as to payment and subrogation is an admission of them. We find also that by failure to file counter-affidavits the defendant has admitted that there is no genuine issue for trial respecting the judgment of conviction and of the indictment incorporated into it.

We find that the defendant Magnafici has not even attempted to refute the allegation of St. Paul that it is the real party in interest and is subrogated to the rights of the Bank. The Court is aware that the attorney for the defendant does not customarily appear in federal courts and admonishes him either to become familiar with federal practice or stay out of federal courts. Now we may address the only real issue before the Court—on a Motion for Summary Judgment where there has been no evidence of embezzlement other than a copy of a judgment of conviction for embezzlement, made a part of an affidavit and not controverted, may the Court make a finding of non-dischargeability under § 523(a)(4) of the Bankruptcy Code without any direct proof of the nature of the transaction alleged?

The question of collateral estoppel has been addressed fairly recently in two United States Supreme Court cases, *Blonder-Tongue*[5] and *Parklane*[6]. The Sixth Circuit Court of Appeals has just considered the question in *Spilman v. Harley*,[7] and two recent law review articles have discussed the matter in somewhat broader terms.[8] No present purpose would be served by plagiarizing any of those excellent analyses of the development and present stature of the doctrine. It is in order, however, to demonstrate why collateral estoppel has been having and will continue to have a greater impact in bankruptcy courts than it has in the past and why the development in bankruptcy courts may be expected to be more rapid than in courts of general jurisdiction.

Collateral estoppel and *res judicata* are related branches of the fundamental principle that "the interest of the state requires that there be an end to litigation."[9] The interest of the state is two-pronged. As between its citizens it wants to have peace and an end to controversy. As to its own function of governance it wants to avoid the expense of unnecessary duplication of services.

The doctrine of *res judicata* may be described as the principle that a *cause of action* which has been litigated shall not be relitigated. Collateral estoppel is broader in one sense and narrower in another and may be described as the principle that an *issue* which has been litigated shall not be relitigated. There are two points of variance between the two principles. The first is that *res judicata* is applicable only where the parties are the same in both the first

and the second proceeding. It is a cause of action which is the focus of the drama. The second is that with *res judicata* it is not important what issues were tried or might have been tried, but only that the cause of action shall have been determined. With collateral estoppel it is necessary that the central issue in the second proceeding actually shall have been tried in the first action. In that respect collateral estoppel is similar to double jeopardy in criminal cases.

An early example of collateral estoppel is the King's Bench case, *Outram v. Morewood*,[10] which involved an action in trespass against a defendant for digging coal from a mine allegedly owned by the plaintiff. In another similar previous trespass action against the same defendant, it had been determined that the plaintiff did not own the mine. Lord Ellenborough described the collateral principle,

"And it is not the recovery, but the matter alleged by the party, and upon which the recovery proceeds, which creates the estoppel. The recovery of itself in an action of trespass is only a bar to the future recovery of damages for the same injury *[res judicata]*: but the estoppel precludes parties and privies from contending to the contrary of that point, or matter of fact, which having been once distinctly been put in issue by them, or by those to whom they are privy in estate or law, has been, on such issue joined, solemnly found against them."

*Cromwell v. County of Sac*,[11] is one of the more lucid early Supreme Court explanations of collateral estoppel. There the plaintiff was the owner of four $1,000 de-

5. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328, 91 S.Ct. 1434, 1442, 28 L.Ed.2d 788 (1971).

6. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

7. *Spilman v. Harley*, 656 F.2d 224, 24 CBC 463 (6 Cir. 1981).

8. Callen & Kadue, *To Bury Mutuality, Not to Praise It: An Analysis of Collateral Estoppel after Parklane Hosiery Co. v. Shore*, 31 Hast. L.J. 755 (1980).

Tannenbaum, *Offensive Collateral Estoppel and the Law of Conspiracy: A New Application for a New Pragmatism*, 14 John Marshall L.Rev. 605 (1981).

9. *Reed v. Allen*, 286 U.S. 191, 198, 52 S.Ct. 532, 533, 76 L.Ed. 1054 (1932).

10. 3 East, 346, 355 (1803).

11. 94 U.S. 351, 24 L.Ed. 195 (1877).

nomination serial maturity coupon bonds issued by the County of Sac to cover the cost of erecting a new courthouse. In a prior proceeding the same plaintiff had sued to recover the matured interest due on several of the coupons and had lost. [In fact, the nominal plaintiff was different, but the Court found that the plaintiff in the second proceeding was the real party in interest in the first.] The second proceeding was to recover the principal of the bonds, but the defense was the same and the issue the same in the second case. It was held that the bondholder was estopped to raise the same issue a second time.

It will have been noted that in the two cases discussed above the parties were the same in both the first case and in the second case. We will now consider two other cases to establish what the law was in the United States prior to World War II and suggest that Professor Polasky's article is a good backdrop.[12] *Bigelow v. Old Dominion Copper Mining and Smelting Co.*,[13] was a situation where two alleged joint tortfeasors were residents of different states. Old Dominion had sued Lewisohn in New York and had lost. This appeal was from a Massachusetts case against Bigelow in which Bigelow contended that Old Dominion was estopped to relitigate the same issue. That contention was denied on the ground that where an alleged offense is joint and several there is not privity between the alleged joint tortfeasors.

*Triplett v. Lowell*[14], is similar in its analysis. The plaintiff was the owner of a patent who had brought a prior infringement proceeding against a different defendant and had lost. The cited case was upon the same grounds against a second defendant who was not privy to the first. In holding that the second action could be maintained, the Court said,

> "While the earlier decision may by comity be given great weight in a later litigation and thus persuade the court to

render a like decree, it is not *res judicata* and may not be pleaded as a defense." In fact, the issue was not whether it was *res judicata*, but whether collateral estoppel would stand. The quotation illustrates two points:

1. the strict requirement of privity, and
2. how frequently *res judicata* and collateral estoppel are confused.

Before discussing how the law has changed since World War II it may be helpful to indicate also how the terminology has changed. The issue of whether the parties, including their privies, need be the same in the second proceeding as in the first is referred to as a question of mutuality, which may be studied as four sets of pairs; these are the only possible combinations of litigants:

### SET ONE

| First Case | Second Case |
| --- | --- |
| Plaintiff one | Plaintiff one |
| Defendant one | Defendant one |

### SET TWO

| First Case | Second Case |
| --- | --- |
| Plaintiff one | Plaintiff one |
| Defendant one | Defendant two |

### SET THREE

| First Case | Second Case |
| --- | --- |
| Plaintiff one | Plaintiff two |
| Defendant one | Defendant one |

### SET FOUR

| First Case | Second Case |
| --- | --- |
| Plaintiff one | Plaintiff two |
| Defendant one | Defendant two |

There is mutuality only in Set One, i.e., that is the only combination where the parties are the same in both the first and in the second proceeding; it is the only combination in which an estoppel could be asserted before World War II. It is the only combination where there is mutuality, which was a requirement until then.

**12.** Polasky, *Collateral Estoppel, Effects of Prior Litigation*, 39 Iowa L.Rev. 217 (1954).

**13.** 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009 (1912).

**14.** 297 U.S. 638, 642, 56 S.Ct. 645, 647, 80 L.Ed. 949 (1936).

Primarily court congestion caused the issue of mutuality to be questioned, and it was re-examined first in *Bernhard v. Bank of America*,[15] where the court focused on the issue of fairness to the party against whom the estoppel was sought to be asserted:

"No satisfactory rationalization has been advanced for the requirement of mutuality. Just why a party who was not bound by a previous action should be precluded from asserting it as against a party who was bound by it is difficult to comprehend.

.   .   .   .   .

In determining the validity of a plea of [collateral estoppel] three questions are pertinent:

1. Was the issue decided in the prior action identical with the one presented in the action in question?

2. Was there a final judgment on the merits?

3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?[16]

It will be noted that *Bernhard* suggests that mutuality is not necessary and that either Set Two or Set Three might be permissible. Where the term "party against whom the plea is asserted" is used, it always refers to the loser in the prior proceeding or his counterpart. *Blonder-Tongue*[17] is a landmark case because it shows the Supreme Court reversing its prior position in *Triplett* and permitting an estoppel to be asserted where the parties to the second proceeding were not the same as in the first. The facts essentially are the same as in *Triplett*; a plaintiff which had lost one suit for patent infringement brought another similar suit, this time against a different defendant. The new defendant was permitted to assert a collateral estoppel based upon the prior adjudica-

tion, and the Court reasoned that it was not unfair to the plaintiff because both times the plaintiff had:

1. selected the issue,
2. selected the theory of the case,
3. selected the defendant,
4. selected the forum, and
5. selected the timing.

After addressing the issue of fairness to the plaintiff, the Court said,

"The broader question is whether it is any longer tenable to afford a litigant more than one full and fair opportunity for a judicial resolution of the same issue.

.   .   .   .   .

"In any lawsuit where a defendant because of the mutuality principle, is forced to present a complete defense on the merits of a claim which the plaintiff has fully litigated and lost in a prior action there is an arguable misallocation of resources."[18]

The terms "issue preclusion" and "collateral estoppel" are used interchangeably to describe the theory that the issue is not to be retried. Where the theory is sought to be applied against the losing plaintiff in the prior proceeding, it is described as "defensive collateral estoppel." The basis for the nomenclature is that the party being sued (or being the object of a counterclaim) is using the determination of the prior proceeding defensively, as a shield. *Blonder-Tongue* sanctioned the use of defensive collateral estoppel where there is no mutuality between the parties. In the classifications set out above this is Set Two.

*Parklane*[19] carried the process one step farther and permitted non-mutual (often referred to as "unilateral") *offensive* collateral estoppel, that is the fact of the winning in the prior case is set up as a barrier to the presentation of a defense; it is used by the plaintiff as a sword. In *Parklane* the plaintiff established without a trial the violation

---

**15.** 19 Cal.2d 807, 812–13, 122 P.2d 892, 895 (1942).

**16.** Rearranged and underscored for emphasis.

**17.** Op. cit. note 5, supra.

**18.** Op. cit. note 5, supra, 402 U.S. at p. 328, 91 S.Ct. at p. 1442.

**19.** Op. cit. note 6, supra.

of securities laws, which had been prosecuted previously by the Securities and Exchange Commission. The same principle of offensive collateral estoppel has been sanctioned officially by a 1980 amendment to § 5(a) of the Clayton Antitrust Act,[20] which permits a civil plaintiff to assert an offensive collateral estoppel against a convicted defendant. In the classifications set out above, this would be Set Three. (Where appropriate, counter-claimant should be substituted for plaintiff, etc). No combination of facts can be imagined which would ever make Set Four applicable.

The Supreme Court approved the principle of offensive collateral estoppel in *Parklane*, after pointing out the very serious miscarriages which a broad use of the doctrine might produce. The first condition is that the plaintiff did not adopt a wait and see attitude in the first proceeding; that is, if the present plaintiff might have joined the first case and stood the risk of loss but did not do so, the plaintiff will not be permitted to assert an offensive estoppel in the second case. In the instant situation, the plaintiff could not have intervened as a plaintiff because the prior action was criminal.

The second condition is that the previous loser must have had an incentive to prosecute his case, or defend himself vigorously.

The third and fourth safeguards established by the Court are refinements of earlier positions respecting identity of issues and whether substantive or procedural defenses might be available in the second suit which were not available in the first.

We take it to be established law that a plaintiff may assert a collateral estoppel against a defendant where such barrier to a new trial would not be unfair nor unreasonable to the defendant. There are two underlying assumptions to this proposition which seldom are discussed:

(1) the proof in the second case will be essentially the same as it was in the first, and

(2) on a given set of facts one judge will usually rule in the same way as would another judge.

Thus, the practical proposition confronting the courts is whether as a matter of efficient court administration the expense of a trial can be justified when the probable results of it will be to reaffirm the decision of an earlier trial. The critical issue then becomes, in part, how high are the probabilities that the results will be the same. The higher the probabilities, the less is the theoretical deprivation to the defendant in not having a second trial. Although not yet described in these terms, it would appear likely that courts with crowded calendars will feel increasingly that granting a full trial where the outcome is predictable because of an earlier trial is a luxury which society can ill afford.

Since the 1970 Amendments to the Bankruptcy Act,[21] which under a revised § 17(c) gave to Bankruptcy Courts the exclusive jurisdiction to determine questions of dischargeability respecting specified tortious liabilities, the doctrine of collateral estoppel has had much greater application in the Bankruptcy Courts than it has had in courts of general jurisdiction. Just as a normal civil proceeding consists of the two elements, liability and damages, so an adversary proceeding respecting dischargeability consists of three elements, liability, damages and dischargeability. A non-bankruptcy court may consider the issues of liability and damages, but it may not rule on the question of dischargeability. In a personal injury case the non-bankruptcy court may determine liability, damages and willfulness, but it can not establish dischargeability or non-dischargeability. The Bankruptcy Court, however, may adopt the findings of the non-bankruptcy court where they have been litigated fully. Thus a Bankruptcy Court might apply offensive collateral estoppel on the issue of liability, or on the issues of liability and damages, or on the issues of liability, damages and willfulness, depending on the extent to which

**20.** 15 U.S.C. 16(a) (1980).

**21.** Pub.L. 91–467.

those issues were litigated in the prior action, but the Bankruptcy Court still would have to determine on the basis of those proven facts whether or not those acts come within § 523(a)(2), (4) or (6). More often than not the findings with respect to liability and damages will be *res judicata* where the parties are the same in the Bankruptcy Court as they were in the non-bankruptcy court. In Illinois, at least, a finding of willfulness must be examined very carefully by the Bankruptcy Court because usually the issue has not been litigated previously and the finding is a pure formality to support body execution as a part of the collection process.

There has been no uniformity of result in the decisions of the Bankruptcy Courts as to whether *res judicata* and collateral estoppel should be applied to the issues of liability, damages, and willfulness or fraudulent intent, for example, but the division in result does not appear to be a disagreement as to the meaning of *Brown v. Felsen*,[22] which uniformly is regarded as establishing the standards to be applied. Rather the division appears to represent decision based upon the specific facts before a particular court as to whether the issues are identical before itself and the previous court, and whether the malevolent intent which is at the heart of the dischargeability facet of the problem was tried in the prior proceedings. A number of the leading bankruptcy decisions on both sides of the question of collateral estoppel are classified in *Spilman*.[23]

Because the proportionate increase in litigated issues has been greater in Bankruptcy Courts than in courts of general jurisdiction, combined with the fact that the caseload per judge has increased even more dramatically because the number of judges has remained constant, we may anticipate that *res judicata* and collateral estoppel will be applied to an increasing extent in Bankruptcy Courts, both as an absolute and in comparison with other courts.

The issue presently before this Court is considerably more complex than the *res judicata* and collateral estoppel questions usually raised in dischargeability proceedings. It is the kind of issue which would not have been entertained prior to *Parklane* because the parties are not the same here as they were in the prior proceeding and because this is a civil proceeding and the earlier action was a criminal case. These variances impose upon the Court a higher degree of responsibility to insure that the issues here are the same that they were in the other proceeding and that they were litigated with the same degree of vigor there as would be demonstrated here if the matter were to go to trial.

Before we can determine whether it would be reasonable and fair to the debtor to permit the judgment of another case to stand as a finding in this proceeding, it is necessary to compare in detail the issues under consideration there and here. Preliminarily, we will state that a higher degree of proof is required in a criminal case than in a civil case so that if something has been proven beyond a reasonable doubt it necessarily has been proven by a preponderance of the evidence.

The first count of the indictment was a conspiracy count. It would be possible for a passive conspirator to be convicted of a conspiracy even though he had not committed the essential criminal act; that is, a conspiracy to embezzle is different from an embezzlement and conviction of the first does not preclude an acquittal on the second. Thus the facts of Count One do not fit the guidelines of collateral estoppel.

The second count of the indictment related to the making and possession of false statements in violation of §§ 1001 and 1002 of the Criminal Code, and the conviction was for violation of §§ 101 and 102 [sic] of the Criminal Code. We will not even consider whether the making of false statements is the same offense as fraud, embezzlement or larceny because we feel that it would not be appropriate to base a dis-

---

**22.** 422 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).

**23.** Op. cit. note 7, 656 F.2d 224, 24 C.B.C. at pp. 467–468.

chargeability judgment upon a conviction judgment which is erroneous upon its face.

■ Thus we come to Count Three of the indictment:

"knowingly, wilfully, and with intent to injure and defraud said bank, did embezzle, abstract, purloin, misapply and cause to be misapplied monies, funds and credits belonging to and entrusted to the care, custody and control of said bank in the amount of approximately Seventy Thousand Dollars ($70,000) . . ."

The question before us is whether a finding of guilty of having performed those acts necessarily means that the debt created hereby was

"for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

Rather obviously, if the complaint in the instant case had been directed toward larceny, the issues before the two courts would not necessarily have been the same and collateral estoppel would not have been applicable. As it is, the allegations in the dischargeability complaint are essentially the same as the averments of the indictment. The finding in the conviction of judgment that Magnafici was guilty of "embezzling and mis-applying funds of a Bank" is essentially the same as the "embezzlement" condition of § 523(a)(4) of the Bankruptcy Code.

There is one minor difference in the issues proved in the prior proceeding and that to be proven in the instant case. In order for the Congress to establish the crime of § 656 as a federal crime it is necessary to have some nexus to the federal government. That section makes it a crime to embezzle from a national bank, a member bank of the Federal Reserve System, or a bank whose deposits are insured by the Federal Deposit Insurance Corporation. § 523(a)(4) causes embezzlement to be a non-dischargeable offense but does not have any designations with respect to the victim. It is admitted in the instant pleadings that Magnafici was employed by a national banking institution, but that is not germane to the issue of collateral estoppel.

§ 523(a)(4) is directed toward the improper taking of money, not from whom it was taken, and we find that the essential issue was the same in the prior proceeding as it is here.

Where the party advocating the estoppel was not a party to the prior proceeding, a question always arises as to whether the loser in that case had given his best effort to the case.

In the prior case a fine of $5,000 and five years imprisonment were the potential punishment for conviction of the embezzlement charge. There has been no suggestion made that the defendant would not be as interested in presenting his best defense in that type proceeding as he would be in an adversary proceeding to have determined that a $70,000 liability be held non-dischargeable.

From everything which this Court has been able to glean about, the embezzlement evidence which was presented in the District Court criminal proceeding and that which would be presented in the Bankruptcy Court case, there is no difference. We find that "embezzling" under the Criminal Code is essentially the same as "embezzlement" under the Bankruptcy Code. There is no reason to believe that this Court would view the evidence any differently than did the District Court, except that the degree of proof is not as high here.

Therefore, we adopt the judgment of the District Court and find that the debt owed to St. Paul is not dischargeable. No counter-affidavit having been filed contesting the amount of the debt owed, we enter judgment for St. Paul in the amount of $70,000.